**UNITED STATES of America**

v.

**John G. BENNETT, Jr.**

**No. CRIM. A. 96–503.**

United States District Court,
E.D. Pennsylvania.

March 18, 1997.

Odell Guyton, Miller, Alfano and Raspanti, P.C., Philadelphia, PA, for Defendant.

Richard Goldberg, Philadelphia, PA, for U.S.

## MEMORANDUM

LUDWIG, District Judge.

Defendant John G. Bennett, Jr. moves for pretrial rulings on the admissibility of his mental health experts' testimony, citing *United States v. Pohlot,* 827 F.2d 889, 905–06 (3d Cir.1987) ("Districts court should admit evidence of mental abnormality on the issue of mens rea only when, if believed, it would support a legally acceptable theory of lack of mens rea … [and] should evaluate the testimony outside the presence of the jury."). The government subsequently joined in defendant's request. This memorandum follows the entry of the pretrial rulings yesterday.

Defendant, as part of a joint submission with the government, summarized the questions that he proposed to ask his witnesses together with their anticipated responses. The issues relate solely to mens rea and not to the defense of insanity.[1] At a hearing, the evidence consisted of the testimony of defendant's psychiatrist, the government's psychiatrist and its psychologist, the evaluation report of defendant's psychologist, and exhibits.

The indictment charges defendant with seven crimes, in 82 counts.

1. Count One—Bank fraud, 18 U.S.C. § 1344.

2. Counts Two—Thirty-five—Mail and wire fraud, 18 U.S.C. §§ 1341 & 1343.

3. Count Thirty-six—False statement to the government, 18 U.S.C. § 1001.

4. Counts Thirty-seven—Thirty-nine—False tax returns, 26 U.S.C. § 7206.

5. Count Forty—Impeding the Internal Revenue Service, 26 U.S.C. § 7212.

---

1. Defendant withdrew his previously noticed defense of insanity. He affirms his competency to stand trial. At the government's request, a forensic psychiatrist, acting as a court-appointed expert, evaluated defendant and found him competent. 18 U.S.C. § 4241(a) & (b).

6. Counts Forty-one—Fifty-five—Money laundering, 18 U.S.C. § 1957.

7. Counts Fifty-six—Eighty-two—Money laundering to promote scheme, 18 U.S.C. § 1956(a)(1)(A)(1).

The government described the facts of the case as follows:[2]

> [I]n 1989 the defendant engaged in a check kite. In order to cover the overdrafts from this fraud, all of which affected his personal and for profit business accounts, he deposited the first checks from his New Concepts Program into his checking account at [a] bank. The New Concepts Program was a plan in which individuals put up money for charity [to] be held for several months by the defendant's organization, the Foundation for New Era Philanthropy.... [A]nonymous donors would allegedly match the money to be provided to the charity of the individual's choice—in other words, the individual's donations would be doubled. Later, the scheme expanded to allow non-profit organizations to deposit funds in the New Concepts Program. Organizations and individuals were told that their money was held in Treasury Bills at the Prudential Securities office in Kenosha, Wisconsin, but were not told that the "quasi-escrow" accounts ... was really a margin account controlled by [defendant] that frequently had a large debit balance. ... [T]he Foundation for New Era Philanthropy received tax exempt status, and a license to act as a charity in Pennsylvania, by filing documents with the Internal Revenue Service and state authorities which did not include the matching program in its list of operations. [Defendant] also filed several tax returns for tax exempt organizations which were false in that they did not refer to the matching program, listed a [non-existent] board of directors, and significantly understated New Era's liabilities. Moreover, during an [IRS] audit, [defendant] provided the auditor with fabricated board of directors minutes, and failed to disclose ... the existence of the New Era Concepts Program and the true state of [New Era's] assets.

Several of the money laundering charges are based on [defendant's] expenditures to promote New Era. Other[s] result from [his] purchases ... of homes for himself and his children, luxury cars, and first-class world-wide travel.

The anonymous donors never existed. [He] used the money from new investors to pay off earlier commitments. He expanded the program to Europe and Asia to increase sources of funds. In the last nine months before New Era's collapse ..., he drew increasingly large margin loans on his account at Prudential.... [He] paid his accountant $50,000 to stop asking difficult audit questions.

... [I]n May, 1995 Prudential called [his] loan. Unable to meet his obligations, [defendant] agreed to put New Era into bankruptcy.... [He] told both his staff and New Era's attorneys that the anonymous donors had never existed.

After the hearing, the government submitted additional financial data, including five exhibits:[3]

> [When New Era ceased operation, in] May, 1995[it] had a liability of over $270 million. Of this ... $135 million was to be provided by ... "anonymous donors."

Exhibit A, "Matching Fund Needed for Total Scheme," shows that over $354 million was collected. An equal amount of matching money was necessary. No matching funds were received. Defendant claims that he fantasized nine anonymous donors whom he named for Dr. Sadoff. This exhibit shows the total of contributions to New Era—[$32,090,543]. Even if ... sent to match other contributions, the shortfall ... would be over $321 million.

Exhibit B, "New Concepts Program Shortfalls" shows how New Era's astronomical liability grew over the years. From 1989 through May, 1995 defendant's liability grew to over $708 million....

Exhibit C ... shows that in some years there were no incoming funds from the named "anonymous donors"....

---

**2.** Government's Response to defendant's Motion for Hearing, section I.

**3.** Government's Supplemental Submission, at 5–7, Exhibits A–E.

Exhibit D ... [shows that] over $300 million, approximately 85% of the funds sent to New Era, came from organizations. Organizations only sent money ... to be matched and returned ... not to match the funds of others.

Exhibit E compares disbursements from defendant's "God's Account" with his other personal expenditures. Four years of contributions ... through "God's Account" totalled $29,115. A compilation of only some of the defendant's personal expenditures during the operation of New Era ... totalled over $1 million.

According to defendant's mental health experts, whose qualifications are not contested, defendant, now age 59, is suffering from a severe personality disorder and also from brain dysfunction or cognitive damage— "slippage"—resulting from automobile accident head traumas a number of years ago. These conditions, they maintain, were accompanied by his delusion, or fantasy, that there were anonymous donors whose contributions would make New Era economically feasible.[4] They portray defendant as having had a sincere and genuine belief that he was doing God's will and that New Era was a "Kingdom Focus" to end suffering and ameliorate the world for God's glory.[5]

The government's experts disagreed with most of the conclusions reached by defendant's experts.[6] Nevertheless, the government does not expressly object on the

ground of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Its threshold disputes are with a narrower approach to Rule 702 and as to Rule 403 admissibility. However, there is little evidence that defendant's experts performed their evaluations improperly or irregularly—or unscientifically. They may have been remiss in not looking into the economic operation of defendant's organization and ascertaining the enormity of its losses. Those matters could reflect on their assessment of defendant's condition as well as its relationship to his mens rea, both in clinical and legal terms. Still, without deciding the applicability of *Daubert* to their testimony, it appears that the government's initial objections raise issues as to weight and not admissibility.

The relevance, scope, and form of the testimony of defendant's experts must also be decided. *Pohlot* teaches that evidence bearing on mens rea is admissible because it relates to an essential element of guilt. *Pohlot*, 827 F.2d at 897. The mental state at issue is "actual" mens rea—which is not a matter of the individual's mental capacity but of the state of mind at the particular time in question. *Id.* at 906. What is involved is a rule of evidence, not a defense. *Id.* at 897, 903. Relevance, therefore, depends on the legal ingredients, or definition, of the pertinent mens rea. Where mens rea includes specific intent or knowledge, it goes beyond mere conscious awareness of conduct. The

---

4. In his testimony, defendant's forensic psychiatrist gave the view that the "anonymous donors" were more likely a fantasy than a delusion inasmuch as defendant, without any treatment, came to the realization that they did not exist. Tr. at 47, 67 (Mar. 3, 1997).

5. The forensic issues inherent in such testimony are complex and uncertain and have been debated by mental health professionals, judges, and academics for many years. Does a personality disorder constitute mental illness, albeit it is included in the several editions of the Diagnostic and Statistical Manual of Mental Disorders, produced by the American Psychiatric Society, the so-called "Bible" of the profession? If not a mental illness or treatable abnormality, may a personality disorder form the basis of a traditional lack of mental health defense, such as insanity, or a condition, such as committability? Where the M'Naghten standard prevails, as in the Insanity Defense Reform Act of 1984, 18 U.S.C. § 17,

should a defendant be allowed to assert what is, in effect, a lesser standard, or defense? Here, for example, defendant's experts do not believe defendant was legally insane, although their position that he lacked mens rea would bring about the same not guilty result. Should the morality or "goodness" of a defendant's purpose affect the question of guilt or innocence? Are mens rea concerns limited to crimes involving specific intent? To what extent, if any, should a mental health professional be permitted to express an opinion or view on the connection between a defendant's mental disorder and his or her state of mind on a particular occasion? Almost all of these often vexing problems can be avoided in this case.

6. The government's experts had not interviewed or tested defendant. They testified on the basis of materials received from defendant's experts and from the government.

question is whether the expert evidence, if believed, would "support a legally acceptable theory of lack of mens rea." *Id.* at 906.

Regardless of relevance, the scope and form of the expert's testimony are subject to F.R.E. 704(b), which was adopted in conjunction with the Insanity Defense Reform Act of 1984—and which was also Hinckley-driven:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier-of-fact alone.

F.R.E. 704(b).

The mental health expert may testify to the expert's examination and diagnosis and to other clinical information, such as the patient's history and the patient's version of what occurred, in order to give the jury information from which to determine whether actual mens rea was present.[7] The mental health expert may not testify to the expert's opinion or inference on that issue, directly or by hypothetical question.[8] *United States v. Boyd,* 55 F.3d 667, 670–71 (D.C.Cir. 1995); *United States v. Thigpen,* 4 F.3d 1573, 1580 (11th Cir.1993).

A further limitation is that under F.R.E. 702 the expert's testimony must "assist" the fact-finder. Here, the expert testimony relating to defendant's alleged delusion or fantasy regarding "anonymous donors" may be relevant to the mens rea for mail fraud. If, for example, defendant actually believed sufficient monies would be forthcoming to match and repay the investments, as promised, a jury could decide that fraudulent intent had not been proven. Such testimony could assist the jury, and its probative value would not be outweighed by the danger of undue prejudice or confusion under F.R.E. 403. However, before such evidence may surmount the F.R.E. 401 relevance and F.R.E. 702 hurdles, it must be shown that, given the actual facts and circumstances, it supports a legally acceptable theory of lack of mens rea. The expert must be prepared to testify to information that supplies at least a partial basis for, or leads to, the logical finding that the mens rea—for example, in the case of mail fraud, the specific intent to defraud— was or may not have been present.[9] Merely conclusory or speculative testimony is not enough.

The same probative value principle pertains to the expert testimony regarding defendant's belief that he was acting as God's agent. His experts drew the conclusion that since he considered himself to be carrying out God's will, he could not have possessed the requisite mens rea for commission of the crimes charged. Regardless of their validity, the experts' opinions or inferences as to defendant's mental state—in the legal sense— are barred by F.R.E. 704(b). However, the question remains as to the probative value of any expert testimony that defendant believed his actions were at God's behest. Motive is not an essential element of guilt and need not be proven by the government. The morality of one's conduct may be relevant to a legal insanity defense.[10] But, by itself, moral rec-

---

7. The legislative history is specifically to this effect. S.Rep. No. 225, 98th Cong., 2d Sess. 225, *reprinted in* 1984 U.S.C.C.A.N. 3404. Also, however:

> [w]hen ... ultimate issue questions are formulated by the law and put to the expert witness who must then say "yea" or "nay," then the expert witness is required to make a leap of logic. He no longer addresses himself to medical concepts but instead must infer or intuit what is in fact unspeakable, namely, the probable relationship between medical concepts and legal or moral concepts such as free will.

*Id.* at 231, 1984 U.S.C.C.A.N. at 3413 (quoting American Psychiatric Association Statement on the Insanity Defense, at 18–19 (as approved by the Board of Trustees (Dec.1982))).

8. Defendant's constitutional challenge to Rule 704(b) is rejected. *See United States v. Blumberg,* 961 F.2d 787, 789 (8th Cir.1992); *United States v. Freeman,* 804 F.2d 1574, 1576 (11th Cir.1986). These cases, which involve the insanity defense, are not materially distinguishable.

9. Defendant may also adduce non-expert evidence on the issue of mens rea.

10. There has been an ongoing debate whether *M'Naghten* insanity defendants must prove they did not know their acts were both morally and legally wrong. *See State v. Worlock,* 117 N.J. 596, 607–08, 569 A.2d 1314, 1320–21 (1990) (discussing cases). Cardozo's "deistic excep-

titude, regardless of the supremacy of the authority for such approbation, will not negate mens rea. Here, too, it is necessary for defendant to ·show how God's influence or direction fits into a legally acceptable theory that he lacked the state of mind at issue.

In *Pohlot*, an example is given of how mental health evidence may help negate mens rea without raising an additional ground of defense. 827 F.2d at 897 (citing *United States v. Staggs*, 553 F.2d 1073 (7th Cir.1977)). In that case, the defendant, Staggs, was charged with aggravated assault, a law enforcement officer having claimed that defendant had threatened to shoot if the officer approached him. *Staggs*, 553 F.2d at 1074. He contradicted that testimony and sought to introduce the testimony of a mental health professional that Staggs' mental state made him unlikely to threaten the officer. *Id.* at 1074–75. Reversing the district court, the court of appeals ordered that the jury hear the expert's evidence. *Id.* at 1077.

In *Staggs*, the proffered testimony was relevant to the issue of defendant's subjective state of mind—i.e., whether he intended to put the officer in apprehension of bodily harm. *Id.* at 1076. That issue involved an essential element of the crime. *Id.* at 1075. The evidence did not involve defendant's motive or the morality of his conduct. *Id.*

As to each of the crimes charged in the present case, while the mens rea requirements vary, all of them involve some type of intentionally false representation. As a matter of law, no amount of honest belief that an enterprise will succeed—or is worthwhile—can justify false, baseless, or reckless assertions or promises. *United States v. Boyer*, 694 F.2d 58, 59–60 (3d Cir.1982). *See United States v. Hannigan*, 27 F.3d 890, 892 n. 1 (3d Cir.1994); *United States v. Cen–Card Agency*, 724 F.Supp. 313, 316–17 (D.N.J. 1989). In order to have probative value as to mens rea, defendant's expert testimony must relate to the particular misrepresentations attributed to him in the indictment.[11] If his clinical condition and symptomology can be logically connected to his subjective belief that his assertions were not false, baseless, or reckless vis-a-vis the truth, such evidence is admissible to show lack of mens rea. Otherwise, it is not—despite a strongly held religious conviction, whether or not arising from mental disorder, that his conduct was morally upright and would be societally beneficial.

Defendant cites *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), in which a conviction of attempting to evade income taxes and failing to file income tax returns was set aside because of the trial judge's instructions on willfulness. The jury was advised that a claim of good faith must be objectively reasonable, irrespective of its honesty. *Id.* at 196, 111 S.Ct. at 608. Defendant, a tax protester, contended that he was not a person required to file a return or to pay income taxes and that wages are not taxable income. *Id.* at 195–96, 111 S.Ct. at 607. The Court held it to be error to instruct the jury to disregard defendant's beliefs, as incredible as his "misunderstandings" of the tax law might be. *Id.* at 203, 111 S.Ct. at 611. "Statutory willfulness," it stated, is the "voluntary, intentional violation of a known legal duty." *Id.* at 201, 111 S.Ct. at 610 (quoting *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (per curiam)).

*Cheek* concerns a claimed belief as to the requirements and applicability of a statute—the Internal Revenue Code—in which willfulness is a prescribed element of a criminal violation. For a mental health expert's testimony to have probative value as to statutory willfulness, it must have some bearing, in factual terms, on the issue of whether there was a voluntary, intentional violation of a

---

tion," *People v. Schmidt*, 216 N.Y. 324, 110 N.E. 945 (1915), concerned the insanity defense.

**11.** Having withdrawn the defense of insanity, defendant is presumed to be legally sane and, in the absence of contrary evidence, to have acted knowingly and with awareness of the consequences of his actions. *See* 18 U.S.C. § 17; *Leland v. Oregon*, 343 U.S. 790, 799, 72 S.Ct. 1002, 1006, 96 L.Ed. 1302 (1952). Defendant's experts offered evidence of brain damage resulting in "cognitive slippage," such as forgetfulness. However, they did not quantify the extent of this dysfunction or suggest that it seriously impaired defendant's consciousness or his cognitive faculties.

known legal duty. The generalized conclusion, without more, that defendant believed he was doing God's work is not sufficient to negate the mens rea of statutory willfulness. What it tends to prove—the morality or goodness of defendant's conduct—is not necessarily inconsistent with a guilty mens rea. It does not by itself tend to show that the alleged violation, here the filing of false tax returns, was not voluntary or intentional or was not a violation of a known legal duty.

Inasmuch as the rulings on relevance objections have been deferred, defendant will be given a further opportunity, within the guidelines set forth in this memorandum, to develop the mental health theory of his case. It is not necessary for the mental health expert's testimony to provide the fact basis for defendant's theory or theories in their entirety or even large part. But the testimony must show some Rule 401 and Rule 702 connection to the lack of actual mens rea for the particular crime charged in the indictment.