UNITED STATES of America

v.

John G. BENNETT, Jr.

No. Crim. A. 96–503.

United States District Court,
E.D. Pennsylvania.

May 27, 1998.

Richard Goldberg, U.S. Attorney, Philadelphia, PA, for U.S.

Odell Guyton, Miller, Alfano and Raspanti, P.C., Philadelphia, PA, for John G. Bennett, Jr.

## MEMORANDUM

LUDWIG, District Judge.

On September 22, 1997 defendant John G. Bennett, Jr. was sentenced to 144 months of custody, followed by three years of supervised release.  On March 26, 1997 he had entered a conditional plea[1] of *nolo contendere* to an 82–count indictment.  The charges were fraud and related offenses arising from his conduct as president and sole director of the not-for-profit corporation known as the Foundation of New Era Philanthropy.  Revised PSR ¶ 1.[2]

The specific charges were one count of bank fraud, 18 U.S.C. § 1344; 16 counts of mail fraud, 18 U.S.C. § 1341; 18 counts of wire fraud, 18 U.S.C. § 1343; one count of false statements, 18 U.S.C. § 1001; three counts of filing false tax returns, 26 U.S.C. § 7206; one count of impeding the administration of revenue laws, 26 U.S.C. § 7212; 15 counts of money laundering, 18 U.S.C. § 1957; and 27 counts of money laundering to promote unlawful activity, 18 U.S.C. § 1956(a)(1)(A)(I).  *Id.*

After an evidentiary hearing, the total offense level was fixed at 38, which, taken with a Criminal History Category of I, produced a Guidelines range of 235 to 293 months.  A downward departure of 91 months measured from the bottom of the Guidelines range was granted.

Defendant's request for a downward adjustment for acceptance of responsibility was denied.  Certain downward departure requests also were rejected.  This memorandum amplifies findings on which offense level and downward departure rulings were based.

---

1.  He reserved the right to appeal pretrial rulings as to the admissibility of mental health evidence. Order, March 18, 1997.  The conditional nature of the plea was colloquyed at the time of its entry and again at sentencing.  Transcript, March 26, 1997 at 36;  September 22, 1997 at 9, 20–21.  *See infra* at 518–19.

2.  On September 16, 1997, at the outset of the sentencing hearing, defendant agreed to a redacted Presentence Report that incorporated his "revised objections."

I—Background

From 1989 to 1995, defendant was the president and sole director of the Foundation for New Era Philanthropy,[3] one of seven entities[4] that he controlled during this period of time. Revised PSR ¶ 7; gov't organizational chart. Within New Era, there were a number of "programs," one of which was called "New Concepts in Philanthropy."[5] Tr. Sept. 16 at 15. The operating principle of "New Concepts" involved "matching funds." Initially, individuals were solicited to become "beneficiary donors" whose contributions would be doubled within a set period of time and then given to the charity of the "donor's" choice. Revised PSR ¶¶ 16, 25, 26.

Later, defendant advised[6] religious groups, schools, museums, and other not-for-profit organizations that he could double their money usually in a period of six months.[7] His explanation was that there were extremely wealthy philanthropists who wanted him to distribute their charitable giving anonymously.[8] *See* gov. exh. 149. They also desired to "leverage" their contributions by requiring the money to be matched— which would encourage organizations to do fundraising on their own. The interest earned on the funds deposited with New Era would pay for its scholarship grants to deserving students, and New Era's overhead would be defrayed by the alleged "anonymous benefactors." Revised PSR ¶ 53.[9]

However, in May of 1995, when the matching funds program collapsed, defendant admitted that there were no "anonymous benefactors." Organizations that had doubled their money had done so almost entirely out of funds sent in by other would-be "investors."

In its relatively short life span, the magnitude of the enterprise became enormous— the largest charity fraud in history. At the end, there was a shortfall in excess of $100 million in monies paid in by "investors." New Era had received and churned over $350 million. Substantial amounts went to defendant's other corporations and also to defendant and members of his family.

More particularly, the fact basis for the charges of bank fraud (count 1), mail or wire fraud (counts 2—35), and filing false statements charge (count 36) was as follows. In inducing prospective investors[10] to believe that New Era would double their money, defendant represented that the "benefactors" had "guaranteed" their contributions with "trust agreements" that were kept in his sole possession. Revised PSR ¶ 28. The benefactors—eventually, there were as many as nine, he said—were known only to him, and he had given them his pledge not to reveal their identities. He also informed investors that their monies would be securely held in escrow accounts in a well-known financial

---

3. New Era was given tax-exempt status by the Commonwealth of Pennsylvania and the Internal Revenue Service. The information submitted was false in several material respects. Revised PSR ¶¶ 74–78, 80, 82, 85, 86. *See infra*, II–A.3.

4. These were: The Foundation for New Era Philanthropy; New Era Philanthropy International Trust; The Bennett Group, International; Human Service Systems, Inc.; Multimedia Communicators; The Evelyn M. Bennett Foundation; and The Ameche Foundation. *See* Government's Chart of Companies/Foundation Operated by John Bennett. In defendant's view, each entity was part of his all-encompassing goal of charitable giving, which he called "Save the World for the Glory of God." Tr. Sept. 16 at 128–130.

5. "New Concepts"—the matching program—referred to both as "program" and "fund." Tr. Sept. 16 at 166.

6. New Concepts was begun with individual donors. Revised PSR ¶ 25. On January 1, 1994,

on defendant's solicitation, groups began to participate. *Id.* at 30.

7. On occasion, the holding periods were three, nine or 10 months. Revised PSR ¶ 25.

8. Defendant called these philanthropists "anonymous benefactors." Revised PSR ¶¶ 25, 28.

9. As it turned out, only a small proportion of the funds received was placed at interest. Most were used as security for loans, and New Era's operating expenses were paid from the deposits themselves.

10. Defendant referred to the individual investors as "beneficiary donors" or "anonymous donors." Revised PSR ¶ 26 ("the individuals who provided money to New Era for the purpose of having their contributions doubled by the alleged anonymous donors and sent to other charities by New Era"); defendant's statement at note 1.

institution. *Id.* ¶ 36. All of these representations were false.

During the heyday of New Era, defendant repeatedly gave assurances to investors that the program was continuing to be operated with "trust agreements" and escrow accounts. *Id.* ¶¶ 57–61. He also went to considerable lengths to deter investors from finding out the true nature of the money doubling scheme—*i.e.,* that it was other investors' money—or funds borrowed against investors' deposits, tr. Sept. 16 at 22—and not that of anonymous philanthropists. He restricted the flow of information that could tip off the public or an inquisitive investor.[11] While some contributions were received from genuine donors, 97 percent of the funds received in the matching program came from investors. Tr. Sept. 17 at 98.

Defendant also misrepresented the composition of New Era's board of directors, both to investors and to the I.R.S., and submitted false information to the I.R.S. concerning the program and its operation. *Id.* ¶¶ 74–86. This conduct, in part, was the basis of the charges of false statement, filing false tax returns, and obstruction of the administration of the I.R.S. (counts 36–40). Given his personal control of New Era and his intimate management of its small staff, his defense that he did not knowingly make misrepresentations and false statements or was unaware of them was not worthy of belief.

Transfers of funds from New Era to defendant's other entities were the gravamen of the money laundering charges (counts 41–55). *Id.* ¶¶ 87–102.[12] The charges of money laundering to promote unlawful activity (counts 56–82) consisted of the use of mail and wire fraud proceeds to promote the ongoing New Concepts fraud. *Id.* ¶¶ 103–113.

Defendant's plea of *nolo contendere* was entered after rulings were made on the admissibility of certain mental health evidence. *See* Pretrial Rulings entered March 17 and

Memorandum of March 18, 1997. Those rulings precluded the introduction of testimony from mental health experts as to ultimate opinions on defendant's lack of mens rea. F.R.E. 704(b). It also outlined the evidentiary issues, utilizing *United States v. Pohlot,* 827 F.2d 889 (3d Cir.1987), *cert. denied,* 484 U.S. 1011, 108 S.Ct. 710, 98 L.Ed.2d 660 (1988),[13] and deferred decision on the government's relevance objections so as to give defendant "a further opportunity, within the guidelines set forth in this memorandum, to develop the mental health theory of his case." Memorandum, March 18, 1997, at 13. It described the potential admissibility of mental health evidence as follows: "In order to have probative value as to mens rea, defendant's expert testimony must relate to the particular misrepresentations attributed to him in the indictment [footnote omitted]. If his clinical condition and symptomology can be logically connected to his subjective belief that his assertions were not false, baseless, or reckless vis-a-vis the truth, such evidence is admissible to show lack of mens rea." *Id.* at 11. Thereafter, defendant did not come forward with any additional proffer or request for further pretrial rulings.

## II  Sentencing Guidelines

### A.  Specific Offense Characteristics

1. Amount of loss: 18 levels were added to the undisputed base level of six for the fraud group because of the amount of the loss. U.S.S.G. § 2F1.1(b)(1)(S). The adjustment was in dispute. The government's position was that the amount of the loss should equal either the amount owed to victims at the time of the collapse of New Era ($133 million) less cash on hand ($30 million), a net of $103 million, or the total amount of the investors' (victims') payments ($354 million). Government's proposed findings ¶ 29; gov. exh. 53–55.

---

11. By limiting disclosures by New Era staff, tr. Sept. 19 at 5–6; employees of the financial depository, tr. Sept. 18 at 98; and accountants, tr. Sept. 19 at 52. *See infra* at II–B.1.

12. Defendant admitted transferring monies between organizations to cover shortfalls. Tr. Sept. 16 at 128.

13. Initially, defendant asserted and later withdrew the defense of legal insanity. A court-appointed forensic psychiatrist found him competent to stand trial. Tr. March 26, 1997 at 6 (entry of *nolo contendere* plea). He and his counsel did not contest his competency. *Id.* at 5.

■ Defendant maintained that the amount of the loss should not exceed $21 million, largely because of the restitution of $334 million accomplished by the U.S. Bankruptcy Trustee [14]—which included sizable sums returned by investors that had doubled their money. Government's statement of material facts with defendant's objections at ¶ 128. A $21 million loss would have increased the base offense level by four levels instead of 18. U.S.S.G. § 2F1.1(b)(1)(E).[15]

■ As to a check-kite or bank fraud scheme, loss ordinarily should be calculated at the time when the fraud is detected—not at time of sentencing. *United States v. Shaffer*, 35 F.3d 110, 111 (3d Cir.1994). Under the Guidelines, loss in a fraud scheme arises from the impact on the victim, which is not necessarily related to defendant's gain.[16] *See United States v. Wolfe*, 71 F.3d 611, 617 (6th Cir.1995). A defendant's claimed lack of intent to cause any loss also is not determinative: "A wrongdoer should [not] completely escape a sentence enhancement if his scheme involved a substantial risk of loss merely because, under his own rosy scenario, no loss was intended." *United States v. Monaco*, 23 F.3d 793, 799 n. 10 (3d Cir.1994).

As *Shaffer* emphasized, in a check-kite scheme, there is no collateral security to redress monies taken from victims. 35 F.3d at 114. The same principle pertains to New Era's "matching funds" program. A lack of collateral usually means a substantial risk of loss. This approach comports with the policy behind the Sentencing Guidelines—*i.e.* to "limit the wait-and-see approach to calculating actual loss [at sentencing] to secured loans because with unsecured loans, like those which sometimes result when check kiting schemes are detected, any recovery is entirely speculative." *Id.* at 115.

■ Here, the government's evidence demonstrated that the offense conduct was commenced in 1988–89 with check-kites that permitted defendant to pay off old loans with monies received from new investors. Tr. Sept. 16 at 17–18. As F.B.I. Special Agent Cosgriff testified, the New Concepts program was begun as a check-kite/"Ponzi" scheme to cover cash shortages in defendant's then companies, and the scheme grew, in the form of a pyramid, as the base of investors widened. *Id.* at 19. There was no collateral or other safety net to prevent the ultimate—predictable—catastrophic loss. Moreover, the huge pre-sentence restitution to the victims resulted from the considerable efforts of many individuals other than defendant.[17] The loss was calculated to be in excess of $100 million based on the undisputed evidence as to the amount owed investors when New Era collapsed. *Id.* at 52; gov. exh. 91. Given the alternatives, that figure best approximated the extent of loss attributable to the New Concepts matching program. Because the amount was greater than $80 million, the upper limit of the highest Guide-

14. Judge Arlin Adams.

15. Defendant's theory of loss mistakenly conflated the effect of presentence restitution with the measurement of the seriousness, or magnitude, of the crime, which is intended to be a function of the base offense level. Presentence restitution is a mitigating factor to be considered once the entirety of the crime has been assessed, and extraordinary restitution may result in a downward departure. *See infra* at III–B.

16. Defendant contended that because he had no intent to cause such a loss, *United States v. Kopp*, 951 F.2d 521, 523 (3d Cir.1991) should apply. There, where a defendant fraudulently procured a secured bank loan, the amount of the loss was calculated as the bank's "actual loss, substituting intended or probable loss if either amount was higher and determinable." *Id.* at 523. Unlike theft, a defendant in a fraud action may not intend to deprive the victim of the value of the misappropriated funds permanently. *Id.* at 529.

An example is a defendant who commits fraud in order to obtain a contract albeit intending to perform it. *Id.*

Under *Kopp*, defendant would have had the amount of loss fixed at $21 million, the "actual loss" of the victims at the time of sentencing. However, implicit in *Kopp*'s analysis is that defendant gave the victim—a bank—collateral for the fraudulently procured loan, "an obligation that eventually forced him to forfeit the collateral to the bank." *Id.* at 529. In the matching funds program, the investors' losses were not collateralized.

17. *See In re Foundation for New Era Philanthropy Litigation*, 175 F.R.D. 202 (E.D.Pa.1997) (approving multi-district class action settlement); *Museum of American Jewish History v. John G. Bennett, Jr.*, No. 95–3003, 1995 W.L. 334320 (E.D.Pa. June 2, 1995).

lines bracket for amount of loss, 18 levels were added. U.S.S.G. § 2F1.1(b)(1)(S).

■ 2. More than minimal planning: Increase of two levels for more than minimal planning—not in dispute. Gov't statement ¶¶ 128–129; U.S.S.G. § 2F1.1(b)(2)(A). The conduct at issue lasted over a period of six years and involved a complex and recurrent pattern of activity. *See United States v. Marcum,* 16 F.3d 599, 603 (4th Cir.1994), *cert. denied,* 513 U.S. 845, 115 S.Ct. 137, 130 L.Ed.2d 79 (1994) ("The comments to the guidelines deem 'more than minimal planning' to be present in any case involving repeated acts over a period of time, unless it is clear that each instance was purely opportune").

■ 3. Misrepresentation of defendant acting on behalf of a charity: Increase of two levels—disputed. U.S.S.G. § 2F1.1(b)(3)(A). Defendant asserts that he never "misrepresented" his authority on behalf of New Era and that New Era was a "bona fide organization ... which carried out its charitable grant-making function as represented." Defendant's proposed findings at ¶¶ 151–152.

The following facts support the application of the enhancement. In the opinion of New Era's tax counsel it was "important and appropriate" that the New Concepts program be disclosed on New Era's applications for tax-exempt status. Tr. Sept. 18 at 134. Nevertheless, there was no reference to it on either New Era's application for federal 501(c)(3) exemption or the application for Pennsylvania charitable organization. Gov. exhs. 59, 68, 69, 70, 71, 113.[18] Nor were inter-connected relationships between defendant's for-profit and not-for-profit entities disclosed. Tr. Sept. 18 at 134. In October, 1994 an I.R.S. agent was sent to New Era to investigate the existence of a suspected Ponzi-like scheme. At that audit, defendant himself represented that there was no matching program. Tr. Sept. 19 at 88. At sentencing, defendant admitted having concealed the matching program from the I.R.S. Tr. Sept. 17 at 106–107.

Defendant's claim that he was unaware of New Era's financial operations is incomprehensible and not credible.[19] The staff consisted of a handful of individuals all of whom were responsible to defendant and supervised by him. When called as government witnesses, their testimony portrayed him to be a micro-manager of the programmatic and financial activities of New Era as well as of the other entities that were subject to his control. *See* tr. Sept. 19 at 17. He was an active and forceful CEO who created and organized his companies in his own image. Tr. Sept. 16 at 129–140. He put together the programs, laid out all policies and directed their implementation, and selected personnel. He retained and conferred with attorneys and accountants. He solicited and met with representatives of potential investors—and made or approved all major corporate decisions. *See, e.g.,* trs. Sept. 17 at 73–75, 98–99, 101, 107, 120; Sept. 16 at 161.

At defendant's direction, New Era misrepresented or withheld information essential to its tax-exempt status. *See infra* II–B.1. As related in unrebutted testimony, defendant falsely conveyed to his own staff and to corporate counsel, as well as the public, that there was a board of directors. However, there were no directors other than defendant, although from time to time he talked about appointing them. Trs. Sept. 17 at 106–110; Sept. 16 at 18–19; gov. exh. 137. As one of his attorneys testified, an I.R.S. requirement for tax-exempt status is the existence of a genuine board of directors. Tr. Sept. 18 at 120. Another conceded that although defendant submitted to the I.R.S. a list of board members, in actuality none of the documents concerning the board

---

**18.** New Era tax counsel also noted that the matching program was not listed in the Purpose Clause of the New Era's Articles of Incorporation. Tr. Sept. 18 at 139; gov. exh. 70. This irregularity was important because a matching program soliciting other non-profit organizations would raise different tax law issues from one soliciting individuals. Tr. Sept. 18 at 116–117, 142.

**19.** This was the gist of defendant's testimony, and it also was the post-collapse explanation given by him in a video cassette presentation that was sent to his supporters and to New Era investors. *E.g.,* tr. Sept. 17 at 8, 39, 80–85, 93–95, 98–99; gov. exh. 212.

"matched up"—causing the attorney to be concerned. *Id.* at 138–139. Ironically, in a lecture series conducted by him, defendant admonished charitable organizations about the importance of a board of directors and of proper record-keeping for I.R.S. purposes. *See* gov. exh. 211 (1991 videotape of instructional speech to charitable organizations, marked "Bell Institutes"). Credible evidence was received at sentencing that to satisfy the 1994 I.R.S. audit, defendant had dictated and submitted fictitious minutes of board meetings for 1992 and 1993. Revised PSR ¶¶ 75–76; tr. Sept. 17 at 142–146; gov. exh. 112.

Defendant's misrepresentations allowed New Era to present itself as a legitimate, tax-exempt foundation and facilitated the success of its illegal operation.[20] The government, therefore, met its burden of proving that the enhancement was applicable.

■ 4. The Offense Affected a Financial Institution and Defendant Derived More Than $1 Million in Gross Receipts: Increase of four levels—disputed. U.S.S.G. § 2F1.1(b)(6)(B). Defendant contested having personally gained more than $1 million. Defendant's proposed findings at ¶ 154. The credible evidence supported a finding that he obtained considerably more than that amount.

The offense "affected a financial institution" in that defendant maintained personal and New Era accounts at several financial institutions, including Founders' Bank, the National Bank of the Main Line, and Prudential Securities. *See* revised PSR ¶¶ 87–102.

Defendant's "gross receipts" took two forms. One consisted of payments directly from New Era—money that came almost entirely from the New Concepts matching program. Tr. Sept. 18 at 104. The other involved expenditures made for the benefit of defendant or his family.

Evidence showed that during the operation of New Era, there were transfers in excess of $4 million to defendant's personal accounts or to those of his for-profit companies. Gov. exhs. 58, 91–94. In the words of a government auditor, $4,208,637 was transferred from New Era to "entities in which 100 percent interest is to John G. Bennett, Jr." Tr. Sept. 16 at 61.[21] This total corresponded with the report of defendant's accountant less $800,000 credit for pre-collapse returns of previously transferred assets. *Id.* at 63; deft. exh. 20. Accepting defendant's figures, the amount still exceeds $3 million.

As to expenditures that benefitted defendant or his family, it was proven that more than $2 million went directly to defendant's personal expenses and investments, including the purchase of a house, travel, loans, an expensive car, and transfers of money through for-profit company accounts. Tr. Sept. 16 at 62–66; gov. exhs. 97–108.

As computed by the government auditor, the total of salary paid defendant, together with payments to his family members, Mainline Travel Agency, Merrill Lynch Investments, a Lexus dealership, personal credit card accounts, and for baseball tickets came to $2,449,960. Tr. Sept. 16 at 65.

*B. Adjustments for Defendant's Role in the Offense*

1. Aggravating role: Increase of four levels upon finding that defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive"—disputed. U.S.S.G. § 3B1.1(a). According to its terms, there are two ways in which this enhancement could apply—if defendant was the organizer or leader of a criminal activity that involved five or more "criminal participants," or if defendant was the organizer/leader of a criminal activity that was "otherwise extensive."

---

20. Defendant also frequently stated that he did not "take a dime" from New Era, implying that he did not want to be monetarily compensated for this charitable work. *E.g.,* tr. Sept. 18 at 168. But in reality he and his family received the direct benefit of nearly $2.5 million. *See infra* at II–A.4.

21. Also, as reported by the auditor, aside from the entities under defendant's total control, an additional $3,466,981 was received by two for-profit companies in which defendant was an officer/shareholder (Human Service Systems and Multimedia Communicators). Tr. Sept. 16 at 61–62.

▮ This enhancement does not apply to a solitary offender. *See United States v. Badaracco,* 954 F.2d 928, 934 (3d Cir.1992). Also, in order to be a "leader," defendant must supervise others, not simply be on equal footing with them. *See United States v. Katora,* 981 F.2d 1398, 1405 (3d Cir.1992) (application of enhancement requires both "multiple participants and some differentiation in their relative culpabilities"). "Otherwise extensive" criminal activity is "based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indices of the extensiveness of the activity." *See* U.S .S.G. § 3B1.1, Application Note 3: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered." *See also United States v. Carrozzella,* 105 F.3d 796, 802 (2d Cir.1997) (relying upon Application Note 3).

▮ In this action, there appears to have been just one other "criminal participant," an accountant. The application of the enhancement rests on the "otherwise extensive" prong.

Andrew Cunningham, one of the outside accountants, pleaded guilty in this court to fraud in relation to his accounting work for New Era.[22] Tr. Sept. 19 at 44.[23] In 1994, Cunningham became suspicious and asked defendant about several matters, including payments from New Era to defendant's for-profit consulting firm (Bennett Group International), tr. Sept. 19 at 50–51; fabricated minutes of board meetings presented to the I.R.S., *id.* at 52–55; and lack of documentation to support the matching program, tr. Sept. 19 at 55. Some time after these inquiries, Cunningham informed defendant that he himself was in financial difficulty and needed about $50,000. *Id.* at 56; gov. exhs.

203, 204. Defendant promptly agreed to give him that amount and said: "I guess this means there won't be any more hard questions." Tr. Sept. 19 at 56. According to his testimony at defendant's sentencing, Cunningham felt that he had been "bought." *Id.* From then on, when asked critical questions about New Era's activities, he falsified his answers. *Id.* at 56–57. Cunningham became a criminal participant working at defendant's direction. *See Badaracco,* 954 F.2d at 934.

▮ However, defendant also used a number of ostensibly innocent individuals to facilitate the operation of the matching program, rendering the activity "otherwise extensive." [24] *See United States v. DeGovanni,* 104 F.3d 43, 46 (3d Cir.1997) (enhancement calls for determination that defendant had supervisory role in criminal activity, not merely a supervisory position within a group collectively participating in criminal activity). The following New Era employees worked under his direction: Mary Sinclair (Vice President for Administration), Tracy Ryan (Assistant to the President/Grants Administrator), Bill Bennington (Executive Associate for U.S. Programs), Richard Ohman (Executive Associate for International Programs), Mark Staples (Program Officer), Kristin Bennett (Program Officer), and Donna Ebert (Program Manager/Institute Administrator). Tr. Sept. 17 at 73–75; "Foundation for New Era Philanthropy" organizational chart submitted by the government. Each performed a job that related and contributed to the overall scheme.

As an illustration—defendant's assistant, acting at his behest, did not give the monthly "payment schedules" [25] to New Era's lawyers and accountants who had asked for them. Tr. Sept. 19 at 5–6. She also withheld the list of New Era's board members. *Id.* Defendant utilized the services of several re-

---

**22.** Cunningham was an associate with an accounting firm employed by defendant to perform bookkeeping and tax preparation for New Era and for BGI, one of defendant's for-profit companies. The firm also provided audit services for 1993 and 1994. Revised PSR at ¶ 9.

**23.** *See United States v. Andrew Cunningham,* Cr. No. 96–507, guilty plea memorandum, October 17, 1996. Cunningham cooperated with the gov-

ernment, and was sentenced to 30 months of custody.

**24.** The involvement of nonculpable individuals is relevant not to defendant's role, but to the "extensiveness" of the criminal activity. *See Katora,* 981 F.2d at 1404–05.

**25.** These tallied how much money New Era was expected to remit at the end of each month.

spected outside attorneys and accountants. *E.g.*, trs. Sept. 18 at 119; Sept. 19 at 46–47, 48–49, 52. Their work products, which gave defendant's companies the imprimatur of legality and reliability, reflected the carefully delimited information supplied to them by defendant. *See* tr. Sept. 18 at 120; gov. exh. 143. Moreover, he specifically directed Prudential Securities employees who handled investor inquiries not to divulge the non-segregated nature of these so-called "escrow" accounts. Trs. Sept. 18 at 98; Sept. 19 at 24–27.

Since none of these individuals would appear to have acted with knowledge of New Era's illegal activities, they do not bear "equal responsibility" with defendant for his conduct. *See Katora*, 981 F.2d at 1405 (application of enhancement requires both "multiple participants and some differentiation in their relative culpabilities"). Contrary to defendant's view, the enhancement was not based on defendant's position as president and sole director of New Era. *See DeGovanni*, 104 F.3d at 46 (requirement of supervisory role in criminal activity). Instead, the evidence supports the application of the enhancement because defendant led or directed one criminal participant and at least 13 innocent individuals to assist in the commission of the crimes for which he was indicted.

▆▆▆ 2. Abuse of position of trust— Increase of two levels—disputed. U.S.S.G. § 3B1.3. Our Court of Appeals has held that this enhancement applies when a defendant occupies a position of trust and uses that position in a way that significantly facilitates the commission of the crime. *United States v. Craddock*, 993 F.2d 338, 340 (3d Cir.1993).

As regards the nonprofit organizations and individuals who invested or donated money to be "matched," New Era and defendant occupied positions of trust as fiduciaries. Additionally, as its lone director, defendant had a fiduciary relationship with New Era. When defendant caused significant misrepresentations to be made in order to secure and maintain New Era's "tax-exempt" status, defendant violated his fiduciary duties both to the public and to New Era. *See* discussion *supra* at II–A.3.

Next, as the government proved, defendant used these positions of trust to enable the perpetration of the crimes. While defendant may have been impelled by his intense hopes to "Save the World," he not only was aware that monies were entrusted to New Era, but he also took fraudulent steps to develop and encourage that trust. Defendant's letter to prospective individual investors of January, 1995 enclosed an informational manual about New Concepts and referred investors and donors to New Era's Form 990 and state due-diligence registration. Gov. exh. 13. This is just one instance in which defendant knowingly disseminated material representations that were undeniably false.

To say that investors were greedy and, therefore, took their chances, tr. Sept. 22 at 17, is but a half, self-serving truth. As a Guidelines Commentary aptly observes: "Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct." Similarly, the argument that others, such as Prudential Securities, the accountant, Andrew Cunningham, and counsel helped lead defendant down the garden path, *id.*, must also be flatly rejected. That reputable professionals, at his request, assisted him in carrying out these offenses hardly diminishes his role in them. If anything, the more cogent conclusion is to the contrary.

As repeatedly shown by the evidence, defendant knowingly, purposefully, and repeatedly misrepresented the nature and characteristics of the matching program in order to market it and effectuate large scale participation. At its outset, he claimed that there was an "anonymous benefactor" whose giving made the program feasible. Tr. Sept. 17 at 102–104. Later, as he admitted, New Era distributed to organizations across the United States and, eventually, in England, prospectus-type literature asserting that the "original" benefactor was "extremely pleased" with the progress of the program. *Id.* at 104–105; gov't exh. 149 (New Concepts informational binder distributed to "non-profit organization candidate[s]").

Acting at defendant's sole direction, the Foundation constantly borrowed against and invaded funds that investors had deposited to

**524**

be held, doubled and returned—not encumbered or spent. Defendant assured potential investors that their money would be held for them in accounts at Prudential Securities. Tr. Sept. 17 at 122–123. Nevertheless, as testified to by Prudential employees, all money received was put into a single "command account," which was under defendant's total control and in which funds were merely designated "F.B.O."—"for the benefit of"—the investing organization. Trs. Sept. 18 at 98–99, Sept. 19 at 24, 28–29. Defendant explained to investors that the money would have to be held "in escrow" for set periods of time because of the "anonymous benefactors'" purported instructions. Tr. Sept. 17 at 124; gov. exhs. 13, 149. But as defendant well knew, all the funds received by New Era were commingled and were transferred, at his discretion, to cover shortfalls and to make other improper payments.[26] Trs. Sept. 16 at 128, Sept. 17 at 127–128. These various dealings constituted fact-specific knowing abuses of trust.

▪▪▪ 3. Adjustment for Acceptance of Responsibility—Denied. Defendant claimed that he was entitled to a reduction of two levels for acceptance of responsibility under U.S.S.G. § 3E1.1. Defendant's proposed findings at ¶¶ 162–169. It is a defendant's burden to prove the application of the reduction. *See United States v. McDowell*, 888 F.2d 285, 291 (3d Cir.1989). To do so, a defendant must "clearly demonstrate acceptance of responsibility for his offense." § 3E1.1. Comment 1(a) to § 3E1.1 states that it is relevant whether defendant "truthfully admit[s] the conduct comprising of the offense(s) of conviction." A *nolo* plea, in itself, or for that matter a guilty plea, will not "categorically bar" reduction for acceptance of responsibility. *See United States v. Fields*, 39 F.3d 439, 446 (3d Cir.1994).

▪▪▪ Here, although conceding his knowledge of the occurrence of many of the transactions forming the fact basis of the charges and accepting personal responsibility for them, defendant disavowed having any criminal intent. *See* revised PSR at ¶ 118; tr.

Sept. 17 at 72. He denied knowledge of account balances or of checks signed by him, tr. Sept. 17 at 83, 96, 98–99, of tax forms that he signed, *id.* at 106–108, 137, 139, 140, and of giving his accountants a fabricated list of board members to be submitted to the I.R.S., *id.* at 142. He disclaimed any wrongdoing. *See* gov. exh. 1. Even if the "anonymous benefactors" had actually existed, that position is untenable, given defendant's numerous admitted misrepresentations of material facts and his unauthorized use of investors' monies. *See* tr. sept. 17 at 103, 121. He cannot be said to have clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct, as required by § 3E1.1. Instead, he demonstrated a non-recognition and non-acceptance of personal responsibility.

### III   Downward Departures

#### A.   Downward Departures—Rejected

▪▪▪ Three of defendant's requests for downward departures were rejected. The first was "Age"—U.S.S.G. § 5H1.1. Under the Sentencing Guidelines Policy Commentary, age is not ordinarily relevant either as an offender characteristic or as a basis for a downward departure. It is a discouraged factor. Policy Statement, § 5H1.1. A factor is "discouraged" when it has already been considered in the collation of previous sentences used to formulate the Guidelines prescribed ranges. *See Koon v. United States*, 518 U.S. 81, 95, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996) ("Discouraged factors are those 'not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range' "). Here, defendant's age was 60, which did not warrant a downward departure.

▪▪▪ The second was "Family Ties and Responsibilities, and Community Ties"— § 5H1.6. This factor also is "not ordinarily relevant in determining what a sentence should be outside the guidelines range." Policy Statement, § 5H1.6. Here, at the time of sentencing, defendant had been married

---

**26.** One of his attorneys warned defendant not to commingle finances between his non-profit and   for-profit companies. Tr. Sept. 18 at 130.

for 36 years. Tr. Sept. 18 at 15. The evidence was that despite a difficult childhood as the son of an alcoholic father, defendant graduated from high school and college while working several jobs to help support his mother and three siblings. Tr. Sept. 16 at 102–106. He and his wife had two daughters—both of whom are married. Tr. Sept. 18 at 16. Both have helped support their parents since the collapse of New Era. *Id.* at 18. Defendant's wife became employed part-time. *Id.* at 28.

Additionally, there was evidence as to defendant's community ties. Before he established New Era in 1989, defendant had worked in drug counseling and prevention programs from local to national levels; had created an organization to assist non-profits obtain funding; and had done financial consulting work for a group called "Teen Challenge." Tr. Sept. 16 at 114–117, 119, 121. Defendant also testified to his deep religious faith and to his long-time involvement in religious groups and activities. *Id.* at 111–113. He stated that all of his organizations came under an umbrella philosophy that he described as "Change the World for the Glory of God."[27] *Id.* at 129–130.

Crediting these family and community ties—while they may have significantly weighed in defendant's favor, they were not so extraordinary as to sustain a downward departure on the basis of this discouraged factor. To the extent that the community activities constituted public service and good works, they were considered as part of the downward departure granted under § 5H1.11. *See infra* ¶ III–B.

■ The third rejected request pertained to defendant's "Employment Record" under § 5H1.5, another "discouraged factor." His employment record—which essentially tracks his community activity—was not "extraordinary" in the Guidelines-departure sense.

None of these requests, individually or added together, or with other circumstances,

appeared to warrant the exercise of departure discretion.

*B. Downward Departures—Granted*

■ There were three grounds that were found, either separately or in combination, to support and justify a downward departure. The first was "Military, Civic, Charitable or Public Service; Employment–Related Contributions; Prior Good Works" § 5H1.11. Although not ordinarily relevant in determining whether a sentence should be below the Guidelines range, the evidence demonstrated that defendant's civic, charitable and public service and his good works were exceptional. *See* Introductory Commentary, Part H. His substantial contributions in the areas of substance abuse, children and youth, and juvenile justice were well documented and well recognized. Trs. Sept. 16 at 113–121; Sept. 17 at 31–32, 121–122, 135–136, 150–151.

■ The second was extraordinary cooperation and restitution as a factor not adequately considered by the Guidelines, under § 5K2.0. *See United States v. Lieberman,* 971 F.2d 989, 996 (3d Cir.1992) (downward departure based in part on defendant's extraordinary post-conduct restitution and cooperation was proper under § 5K2.0); *see also United States v. Garlich,* 951 F.2d 161, 163 (8th Cir.1991) (Guidelines provide authority to depart downward based on extraordinary restitution under 5K2.0). Through the admirable work of the U.S. Trustee, the bankruptcy court, and Judge Dalzell of this court, the amount of the New Era loss was dramatically reduced from over $100 million to about $20 million. Revised PSR at ¶ 116; tr. Sept. 17 at 68–71. While defendant did not demonstrate an acceptance of personal responsibility as contemplated by U.S.S.G. § 3E1.1, his close cooperation and his early turn over of the bulk of his personal and company-held assets materially assisted the process of reducing the loss and occurred to an unusual degree. In these circumstances, the post-offense restitution was

---

**27.** According to defendant, each organization he founded shared the four elements of his "Change the World" philosophy: first, that God have a significant influence on the activity, which defendant called a "Kingdom Focus"; second, that the activity "meet people's needs"; third, that the activity be directed to "eliminate pain and suffering"; and fourth, that the activity help "make others' dreams come true." Tr. Sept. 16 at 130.

atypical and merited a downward departure under U.S.S.G. § 5K2.0. *See Lieberman,* 971 F.2d at 995 (noting that such a departure could be justified if extraordinary post-offense restitution existed either to a kind or a degree not considered by the Guidelines) (citing U.S.S.G. § 5K2.0, Policy Statement).

The third is more problematical—a mental health "hybrid" departure involving "Diminished Capacity" under § 5K2.13, an encouraged factor, and "Mental and Emotional Conditions" under § 5H1.3, a discouraged factor.

Section 5K2.13 Diminished Capacity (Policy Statement): If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

■ If a factor is encouraged under the Guidelines, it is a basis for departure unless the applicable Guidelines have taken it into account—which is not so in this case. *See* § 5K2.0, Policy Statement. Here, moreover, the offenses were non-violent and did not result from the use of drugs or other intoxicants, *see* § 5K2.13 and *United States v. McBroom,* 124 F.3d 533, 544 (3d Cir.1997), and defendant had no criminal record. The question was whether he suffered from "significantly reduced capacity." *Id.*

The subject of defendant's clinical condition and relevant diagnoses was hotly debated by a number of prestigious mental health professionals. Dr. Park Deitz, a well-known forensic mental health expert, testified as a government witness that there was no brain damage or mental illness. Tr. Sept. 18 at 49–52, 61; gov. exh. 4. In his view, there was evidence of "malingering" on tests, and while there was a narcissistic personality disorder, it did not impair defendant's cognitive or volitional capacity. *Id.* at 72, 74, and 76. On the other hand, another acknowledged psychiatric expert, Armond Nicholi, a defense witness, believed that defendant had a delusional disorder, *id.* at 82; deft. exh. 35 at 3–5.

In the opinion of a prominent forensic psychiatrist, Dr. Robert Sadoff, also a defense witness, defendant had organic brain dysfunction, and was either delusional or subject to an intense fantasy. Deft. exh. 26 at 8–9. The defense experts thought that defendant's mental capacity was significantly reduced and, specifically, that the "anonymous benefactors" were the product of mental health impairment—*i.e.,* were a genuinely held belief.

The court-appointed expert, Dr. Timothy Michals, a psychiatrist, disagreed -

It is my opinion that Mr. Bennett has not experienced a Delusional Disorder nor has he had evidence of any mental disorder involving any cognitive dysfunctions.... It is my opinion that his claims of amnesia are of a volitional [nature] and not a component of any mental disorder.... In summary, it is my opinion which I express with a reasonable degree of medical certainty that Mr. Bennett did not suffer from a significantly reduced mental capacity at the time of the eighty-two charged offenses nor did he have evidence of a significantly reduced mental capacity which contributed to the commission of any of the eighty-two charged offenses.

Report of Dr. Timothy Michals, Sept. 11, 1997.

Other forensic experts who had tested and evaluated defendant expressed varying opinions as to his mental condition at the time of the indicted conduct. While it may be arguable whether defendant had a delusional disorder or more than mild organic brain dysfunction, there was clear evidence of several personality disorders—narcissism, hypomania, obsessive-compulsive personality, some of which was conceded by the government's experts. Tr. Sept. 18 at 74.

A complicating conceptual point is that personality disorders are listed in the authoritative "Diagnostic and Statistical Manual of Mental Disorders," DSM–IV, published by the American Psychiatric Association. However, many clinicians do not believe a personality disorder is more than a narrative description of one's personality. They therefore distinguish it from a mental disease or

disability and would reject it as a basis for a societal or legal judgment. *See, e.g., United States v. Libutti,* 1994 WL 774647, \*16 n. 11 (D.N.J.1994) ("criteria for diagnosis of 'Pathological Gambling'" and quoting from DSM III–R: "The clinical and scientific considerations involved in categorization of these conditions as mental disorders may not be wholly relevant to legal judgments...").

A number of Circuit Court cases have articulated and upheld that distinction. Examples are: *United States v. Withers,* 100 F.3d 1142, 1147–48 (4th Cir.1996), *cert. denied* — U.S. ——, 117 S.Ct. 1282, 137 L.Ed.2d 358 (1997) (defendant's depression, causing "vulnerability and extreme mental disarray" did not warrant downward departure under § 5K2.13 when there was no evidence of cognitive impairment); *United States v. Edwards,* 98 F.3d 1364, 1371 (D.C.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1437, 137 L.Ed.2d 544 (1997) ("If...a psychological or behavioral disorder serves as the basis for [a 5K2.13] departure...there must be an accompanying inability to reason"); *United States v. Barajas–Nunez,* 91 F.3d 826, 831 (6th Cir.1996) ("[D]iminished mental capacity is found where a defendant's condition affects his ability to process information or to reason"). However, our Circuit in *McBroom,* 124 F.3d at 549–550, expressly decided that Guidelines "Diminished Capacity" included volitional disabilities that had been diagnosed as personality disorders ("cyclothymia" and obsessive-compulsive disorder).[28]

In the present case, defendant devised, developed and managed what became an extremely large financial enterprise. The evidence is that on one level he believed his work was consistent with his religious belief and God-ordained mission. Tr. Sept. 16 at 129–141, 145. He appears not only to have convinced himself—the usual predicate of the empowerment to persuade others—but he also persuaded a large number of community and business leaders. Many responsible, highly successful executives of religious, educational, and cultural institutions, as well as many social and political figures, considered him to be upright and beyond reproach. *E.g.,* tr. Sept. 19 at 103. Here, it may be questionable whether a departure should be attributed to an extraordinary mental and emotional condition (under discouraged factors) or to diminished capacity (under the encouraged factors). Regardless of one's point of view, defendant's cognitive faculties or volition, or both, appear to have been subject to some form of extraordinary distortion and, perhaps, significantly reduced capacity. That characterization of him was widely shared.[29]

▮ Whether taken separately or in combination—*i.e.,* in parallel or in series—or in conjunction with any other factors, these three downward departures supported a reduction of the sentence to 144 months of custody. They did not support any further reduction because of the gravity of the offense conduct, tr. Sept. 22 at 9–10, and the other statutory bases for sentencing.[30] 18 U.S.C. § 3553(a).

---

28. *See also United States v. Morin,* 124 F.3d 649, 651–52 (4th Cir.1997) (defendant's "narcissistic personality disorder" supported departure on the basis of diminished capacity); *United States v. Coleman,* 1997 WL 666512, \*3, 5 (N.D.Ill.1997) (defendant's "dependent personality disorder," a factor in the commission of the offense conduct, was a valid basis for downward departure); *United States v. Skodnek,* 933 F.Supp. 1108, 1122 (D.Mass.1996) ("major depressive disorder," "psychotic disorder," and "obsessive compulsive personality disorder," resulted in diminished capacity that could be a basis for a downward departure).

29. At sentencing—two and a half years after New Era collapsed—a former U.S. Secretary of the Treasury, who had invested and lost several million dollars, asked that defendant be sentenced to probation because he had meant well and had been blinded by his desire to help others.

30. A vocal segment of investors recommended an extremely severe or even "maximum" sentence. Tr. Sept. 22 at 12; gov. exh. 242, vol. one, victim impact letters—*e.g.,* letter, United Way of Southeastern Pennsylvania, May 28, 1997: "We believe that the tremendous negative impact of Mr. Bennett's actions on hundreds of non-profit organizations, on the excellent reputations of numer-

---

ous individuals and organizations, and on the image of those associated with philanthropy in general, warrants severe punishment....[W]e urge the Court to provide the philanthropic community protection from schemes of this nature by sentencing Mr. Bennett to the maximum extent of the law."