**UNITED STATES of America**

v.

**John G. BENNETT, Jr., Appellant.**

**No. 97–1816.**

United States Court of Appeals,
Third Circuit.

Argued June 4, 1998.

Decided Nov. 16, 1998.

Peter Goldberger (Argued), Ardmore, Pennsylvania, for Appellant.

Richard W. Goldberg (Argued), Judy Goldstein–Smith (Argued), Office of United States Attorney, Philadelphia, Pennsylvania, for Appellee.

Before: SCIRICA, NYGAARD and

SEITZ,[*] Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is an appeal from a judgment of sentence and certain pretrial rulings on a nolo contendere plea entered by defendant John G. Bennett, Jr., President of New Era Philanthropy. Bennett was sentenced to 144 months in prison for perpetrating the largest charity fraud in history, a six-year scheme in which he solicited over $350 million in contributions for a bogus "matching" program. We will affirm.

## I. FACTUAL BACKGROUND AND PROCEEDINGS

In 1989, Bennett encountered financial difficulties in connection with several of his businesses. As a consequence, he devised a check-kiting scheme using his bank accounts at Philadelphia National Bank and Merrill Lynch, writing checks from one account to another on insufficient funds and creating false balances reflecting fictitious amounts. To cover the overdrafts, Bennett solicited participation in a new program called the New Concepts in Philanthropy Program, using the initial checks received from New Concepts donors to pay down the overdrafts at Merrill Lynch and the Philadelphia National Bank.

Under the New Concepts Program, individual donors gave money for charitable purposes to be held for several months by another Bennett organization, the Foundation for New Era Philanthropy. Bennett told potential investors that a wealthy donor, who wished to remain anonymous, would match their contributions at the end of the holding period. The doubled funds would then be transferred to a charity of the donor's choice.[1] In reality, there was no anonymous donor. Bennett used the donations of subsequent investors to "double" the deposits of the original investors, and he routinely invaded the held funds to benefit his for-profit businesses.

The "ponzi" scheme grew into a pyramid scheme as the base of investors grew. Bennett expanded the New Concepts Program to allow nonprofit organizations to participate.[2] Eventually, the Foundation for New Era Philanthropy received both tax-exempt status and a license to act as a charity in Pennsylvania. Bennett established and maintained these licenses through a series of falsehoods. For example, he omitted any mention of the matching program from all documents filed with the Internal Revenue Service or state authorities. In these submissions, Bennett also listed a nonexistent board of directors consisting of prominent individuals and he significantly underestimated New Era's liabilities. During a subsequent I.R.S. audit, Bennett provided fabricated board-of-directors minutes, again failed to disclose the existence of the New Concepts Program, and

[*] Judge Seitz heard argument in this matter but was unable to clear the opinion.

1. Bennett made the following sales pitch to wealthy individuals:

 An anonymous donor wants to encourage giving by offering to match charitable gifts to various organizations. To participate, wealthy individuals deposit their funds with New Era for a period of time. At the end of the holding period, the gift will be matched by the anonymous donor and the now doubled funds will be sent to the charity chosen by the original donor.

 (Presentence Investigation Report (PIR) ¶ 18.)

2. While the basic proposal did not change during the existence of New Era, features of the offer did change; for example, Bennett broadened the donor base and delayed the payout period:

 a) Expanding base of participation: The parties eligible to have their funds matched grew from the small number of original donors to over a hundred individuals. Later, in 1993, non-profit organizations were also permitted to participate, and by the end, hundreds had sent funds to New Era. New Era also opened offices in London and Hong Kong and made overtures to the mainland government. Meanwhile, in New Era's literature, the number of alleged anonymous donors grew from one to nine.

 b) Fewer deposit restrictions: At first, nonprofit organizations could only deposit newly raised money with New Era. This restriction was later dropped and organizations were permitted to deposit their endowment funds.

 c) Longer holding period and greater payout: Just months before the end, New Era offered a fund which would pay 150% interest ($2.50 would be returned for each $1.00 invested). The holding period would be nine months rather than six months.

 (PIR ¶ 19.)

misrepresented the true condition of New Era's assets. As a result, New Era received a favorable audit letter from the I.R.S.

In response to due diligence inquiries by potential donors, Bennett made additional false representations:

a) The anonymous donors had signed trust agreement s pledging to match contributions made through New Era.

b) The anonymous donors matched the funds deposited with New Era.

c) Bennett received no compensation from New Era.

d) New Era had a board of directors made up of prominent individuals.

e) Funds deposited with New Era were held in escrow or "quasi-escrow" accounts.

f) The expense of running New Era was paid from the interest earned by deposited funds during the holding period.

Having satisfied investors and auditors that New Era was a legitimate charity, Bennett then systematically transferred New Era funds to his struggling for-profit businesses through loans and stock purchases.

By 1994, Bennett could no longer cover the "doubled" funds solely through new donations. Consequently, he obtained a loan from a brokerage account at Prudential Securities to cover the shortfall. The loan was secured by United States treasury bills that Bennett had purchased with funds donated to New Era by charitable organizations. Bennett informed several of these organizations their money was invested in United States treasury bills and they could call Prudential to confirm that a treasury bill had been purchased in the name of the organization. But instead of revealing the treasury bills were serving as collateral for a loan, Bennett told the organizations their money was being held in low-risk, interest-bearing accounts and escrow or "quasi-escrow" accounts at major financial institutions. The Prudential loan eventually totalled $50 million.

In the final nine months before New Era's collapse, Bennett drew increasingly larger margin loans on his account at Prudential.

In May 1995 Prudential called the loan. Unable to meet his obligations, Bennett agreed to place New Era into bankruptcy and then revealed the anonymous donors had never existed.

In September 1996, Bennett was charged in an eighty-two-count indictment for offenses committed in connection with the Merrill Lynch and Philadelphia National Bank accounts. The indictment charged Bennett with one count of bank fraud (18 U.S.C. § 1344), sixteen counts of mail fraud (18 U.S.C. § 1341), eighteen counts of wire fraud (18 U.S.C. § 1343), one count of making false statements to the government (18 U.S.C. § 1001), three counts of filing false tax returns (26 U.S.C. § 7206), one count of impeding the administration of revenue laws (26 U.S.C. § 7212), fifteen counts of money laundering (18 U.S.C. § 1957), and twenty-seven counts of money laundering to promote unlawful activity (18 U.S.C. § 1956(a)(1)(A)(i)). Bennett originally pleaded not guilty and prepared for trial. Before trial, the District Court ruled to exclude certain questions that Bennett proposed to ask of his expert witness regarding Bennett's mental capacity.

In March 1997, Bennett decided to enter a conditional plea of nolo contendere to all the charges.[3] In an accompanying press release, Bennett emphasized he did not admit guilt or "adopt as true the government's version of the facts, insofar as those facts relate in any way to the issue of his intent to commit the crimes alleged in the indictment." Following Bennett's entry of the nolo contendere plea, the Probation Office compiled its Presentence Investigation Report in anticipation of the sentencing hearing.

## A. The Presentence Investigation Report

The presentence report grouped the charges as follows: (1) bank fraud; (2) mail fraud; (3) wire fraud; (4) false statements; (5) false tax returns; and (6) impeding the administration of revenue laws. It then cal-

---

**3.** Bennett reserved the right to appeal pretrial rulings as to the admissibility of his expert's testimony on mental health.

culated Bennett's adjusted offense level beginning with a base offense level of six under U.S.S.G. § 2F1.1. The presentence report recommended against a reduction in the base offense level for acceptance of responsibility under U.S.S.G. § 3E1.1:

> The defendant has entered a plea of nolo contendere in this case. However, he continues to deny any factual guilt and criminal intent for his actions. In his press release dated March 26, 1997, announcing his plea of nolo contendere, the defendant stated that he does not admit or adopt as true, the government's version of the facts, insofar as those facts relate in any way to the issue of his intent to commit the crimes alleged in the Indictment. The defendant further stated in his press release that he believes that his choice to cooperate with the bankruptcy trustee by surrendering substantially all of his assets to the trustee, which he claims had no relation to New Era, and to cooperate with the Attorney General of the Commonwealth of Pennsylvania and the United States Securities and Exchange Commission regarding civil enforcement activities brought by those entities regarding the collapse of New Era, indicates that he has accepted responsibility. It appears that his choice to cooperate with the bankruptcy trustee and the other parties bringing civil action against him benefits him in the same way as his plea of nolo contendere in the criminal matter. In other words, the defendant arrives at an outcome which may have been inevitable anyway, but with much less negative publicity and stress to himself and his family. His cooperation is not an indication that he admits wrongdoing. In fact, he stated as much in his press release. Furthermore, the defendant's for profit companies received approximately $7 million as a result of his fraudulent activities, which ultimately resulted in benefit to him.

The presentence report also called for an eighteen-level increase for the loss caused by Bennett's conduct, suggesting "[t]he loss in this case at the time the offense was discovered was approximately $135,000,000; although the total amount of funds taken from the victims was approximately $354 million. Pursuant to § 2F1.1(b)(1)(S), because the loss in this case was over $80 million, 18 levels are added." It also recommended that two levels be added because the offense involved "more than minimal planning" under § 2F1.1(2)(A) and (B): "[T]he defendant committed repeated fraudulent acts over a period of time, and ... this offense involved a scheme to defraud more than one victim."

The report suggested an additional two-level increase because the criminal conduct involved the misrepresentation that Bennett was acting on behalf of a charitable, educational, religious, or political organization:

> The misrepresentation took place in three ways. First, the defendant was able to secure a favorable rating from the Internal Revenue Service for the Foundation for New Era Philanthropy as a charitable organization, by submitting fraudulent documentation to the IRS, and by failing to disclose information regarding the New Concepts program to the IRS. The defendant did this knowing that the New Concepts program was in fact, a fraudulent scheme. The second aspect of the misrepresentation was the New Concept program itself, wherein the defendant told the victims of non-existent anonymous donors, in an effort to solicit contributions from them. In addition, the defendant used the favorable rating that he fraudulently received from the IRS to solicit funds from the victims. The third aspect to the misrepresentation is that the defendant used the charitable image of New Era to divert several million dollars to his for profit companies, which ultimately benefitted the defendant personally. Pursuant to § 2F1.1(b)(3)(A), two levels are added.

Invoking § 2F1.1(b)(6)(B), the report also recommended a four-level increase because Bennett derived more than one million dollars in gross receipts from an offense affecting a financial institution. Specifically, the report noted Bennett "used a brokerage account at Prudential Securities to obtain sufficient funds to facilitate this offense. Overall, the loan from Prudential to New Era was approximately $50 million."

The report also recommended upward adjustments for Bennett's "aggravating role" in

the offense and for his abuse of a position of trust. First, it described Bennett's role in the offense:

> [Bennett] was the organizer and leader of New Era, which was used in the commission of an extremely extensive fraud. Several employees carried out the defendant's orders which served to facilitate this offense. Most of the employees were unaware of the defendant's fraudulent activities; however, to date the defendant's accountant has entered a plea of guilty to charges related to this offense. In addition, the defendant utilized the services of many other innocent individuals to promote the goals of New Era. Pursuant to § 3B1.1(a), the offense level is increased by four levels.

Next, the report discussed the position of trust Bennett occupied: "[Bennett] was entrusted as a fiduciary by the victim organizations. The defendant abused the trust placed in him by these organizations by diverting money to his for profit companies, which had been entrusted to him for charitable purposes."

These enhancements created a subtotal adjusted base offense level of thirty-eight for the first group of closely related counts. The second group of closely related counts consisted of money laundering and money laundering to promote unlawful activity. Under U.S.S.G. § 2S1.1(a)(1), Bennett had a base offense level of twenty-three. The presentence report called for a three-level enhancement based on the amount of money laundered: "approximately $528,016. Pursuant to § 2S1.1(b)(2)(D), since the value of the funds was more than $350,000, but less than $600,001, the base offense level is increased by three levels." The District Court explicitly adopted the factual findings and guideline application of the presentence report in its judgment and commitment order.

## B. The Sentencing Hearing

In September 1997 the District Court held a four-day sentencing hearing. At the close of testimony, the court commented on the burden of proof: "[T]he defense's position is that the government must meet its burden of proof by clear and convincing evidence.

While I believe the correct standard is a preponderance of the evidence, the evidence presented is sufficient to meet the higher standard." The court then made several findings with respect to enhancements to the base offense level:

> [F]or the amount of the loss 18 levels are added because the loss was more than $80 million, in this case at least $100 million. Next, two levels are added for more than minimal planning, which is not in dispute. Next, two levels are added because the offense involved misrepresentation that the defendant was acting on behalf of a charity. Next, two levels are added because the offense affected a financial institution and the defendant derived more than $1 million in gross receipts from the offense.

> Next, four levels are added because of the defendant's role in the offense as an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. And next, two levels are added because defendant abused a position of trust in a manner that significantly facilitated the commission or concealment of the offense.

> Correction as to the specific offense characteristic involving a financial institution and that defendant derived more than a $1 million in gross receipts from the offense, it should be four levels are added, not two as I mis-spoke.

> After I ruled that certain testimony from his mental health experts would be inadmissible at trial, Mr. Bennett entered a conditional nolo contendere plea, conditional in that he reserved the right to appeal my ruling.

> \* \* \*

> The request by the defense for a decrease based on acceptance of responsibility must be denied. To obtain this decrease the guidelines require that the defendant clearly demonstrates acceptance of responsibility for the offense, which did not occur in this case.

At the close of sentencing, the District Court made additional remarks addressing the "ag-

gravating role" and "abuse of a position of trust" enhancements:

> Moreover, the argument that others, such as Prudential, Andrew Cunningham and the lawyers helped walk Mr. Bennett down the garden path must also be rejected. Whether or not anyone whose services he utilized assisted him in his request in carrying out these offenses does not diminish his role in it. It can well be argued to the contrary. Unfortunately, a person's conduct often differs from what one says or professes to believe in.

* * *

> In addition to misapplying funds that were entrusted to him, he also obtained very large amounts of money for his personal benefit. He had total control over both New Era and his for profit corporation and thereby channeled money that came into New Era to pay himself, while maintaining that he was serving New Era without charge.

Bennett's offense level and criminal history category targeted a guideline range of 235–293 months imprisonment. But the District Court determined a downward departure was appropriate:

> [T]he law requires that the sentence imposed reflect the seriousness of the offense. Given the enormity and gravity of this case, a guidelines range sentence on that basis could be justified. The amount of harm and the number of persons harmed and the still ongoing repercussions experienced by the charities and nonprofit organizations and those who benefit from their activities are incalculable. It may well be that any lesser sentence than within the guidelines range will be criticized as under-representing or depreciating the inordinate size and gravity of the damage done in this case.
>
> However, I have determined to make a downward departure from the guidelines range by reason of the presence of three factors or grounds. Each of these departure factors is found to be sufficient by itself to support the extent of the departure. But whether taken singularly or in any combination, they do not in my view justify any further departure because of the seriousness of the offense.
>
> Moreover, certain departure factors requested by the defense must be denied. The sentencing guidelines contain policy statements that discourage the consideration of various factors in determining whether a sentence should be outside the guidelines range. The reason is that these factors, at least to the extent that they are generally present in a case, have already been included in the sentencing guideline categories.
>
> The Supreme Court has said that these so-called discouraged factors may be a basis for departure only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. Discouraged factors include age, family responsibilities and community ties and employment records. And none of these factors in this case is sufficient individually or in combination to be the basis for a departure.
>
> One discouraged factor that is present to an exceptional degree is called military, civic, charitable or public service employment related contributions, record of prior good works. It is evident that for many years leading up to 1989 Mr. Bennett made a large number of civic, charitable and public service contributions and performed good works in the areas of substance abuse, children and youth, juvenile justice.
>
> These went far beyond the community contributions generally made even by very civic minding and good-hearted people. They are the first basis for the downward departure. No credit is given for contributions and activities after 1989 because of their interrelationship with the offense conduct.
>
> The next separate basis for departure is extraordinary cooperation and restitution. Through the exceptional work of the trustee, the Bankruptcy Court and Judge [Dalzell] of this Court, the amount of the New Era loss was reduced from over $100 million to about $20 million. Mr. Bennett's cooperation and his turning over the bulk of his personal and company held assets

greatly facilitated this process and occurred to an unusual degree. Our Court of Appeals has recognized that such efforts may distinguish a case and if so, may warrant departure.

The third basis for departure involved Bennett's mental capacity, which the District Court considered "problematical":

> On the one hand, a discouraged departure factor is called mental and emotional conditions. On the other hand, an encouraged factor is called diminished capacity.
>
> \* \* \*
>
> If a factor is an encouraged factor, it is a basis for departure unless the applicable guidelines already take it into account, which is not this case. The subject of Mr. Bennett's clinical condition and applicable diagnoses has been hotly debated by a number of prestigious mental health experts. While it appears unlikely that he had a delusional disorder or more than, at worst, a mild organic brain dysfunction, there is evidence of severe personality disorders, including narcissism, hypomania, obsessive-compulsive personality, at least some of which is agreed to or not contested by the government's experts.
>
> A complicating factor is that while personality disorders are listed in the Authoritative Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association, many clinicians do not believe a personality disorder is any more than a description of one's personality. They therefore distinguish it from a mental disease or disability and reject it as a basis for legal judgment.
>
> Court cases, however, have not seen fit to make that distinction, particularly recently. In the present case, Mr, Bennett devised and developed and completely managed what became an extremely large financial enterprise. The evidence is that on one level he believed his work was consistent with his religious beliefs and God ordained mission. It appears that he not only was convinced himself, which usually is basic to convincing others, but he also convinced many responsible established and highly successful executives and religious, educational and other community institutions, as well as many social and political leaders.
>
> Here, whether this basis for departure is grounded in an extraordinary mental and emotional condition under the discouraged factors or in a diminished capacity under the encouraged factors it appears from all the evidence that Mr. Bennett's cognition of volition or both were subject to a very unusual distortion and significantly reduced mental capacity.

Therefore, the District Court departed downward 91 months and imposed a sentence of 144 months imprisonment.

## II. DISCUSSION

### A. Pretrial Rulings Concerning Expert Testimony

Before deciding to plead nolo contendere, Bennett had filed notice of his intent to rely on the defense of insanity and to offer both lay and expert testimony on his mental condition. After Bennett requested a hearing to determine the admissibility of expert testimony on his mental disorders, he and the Government filed a joint submission containing a "Summary of Questions and Anticipated Responses." The District Court held the requested hearing and thereafter issued an order disallowing certain submitted questions.

Ten "General Questions" were submitted, two of which were:

> Q: In your opinion, to a reasonable degree of medical certainty, do you believe that the mental orders you state Mr. Bennett suffers from precluded him from forming the intent to defraud?
>
> Q: In your opinion, to a reasonable degree of medical certainty, do you believe the mental disorders you state Mr. Bennett suffers from make it highly unlikely that he could form the intent to defraud?

The District Court determined:

> 1. As to all General Questions excepting the last two, objections based on F.R.E. 702 and 403 are overruled. Rulings are deferred as to relevance,

F.R.E. 401. To have probative value, answers must provide sufficient fact basis for a finding of lack of actual mens rea. Objection to the use of the word "facts" in the third question is sustained.

2. As to the last two General Questions (opinions as to forming intent to defraud), objections are sustained. F.R.E. 704(b).

*United States v. Bennett*, 29 F.Supp.2d 236 (E.D.Pa.1997) (Pretrial Rulings). Three questions relating to bank fraud were submitted, the last of which stated:

Q: In your opinion, to a reasonable degree of medical certainty, did any of the mental disorders that Mr. Bennett suffers from make it unlikely that he would have engaged in conduct designed to defraud a bank?

Citing Federal Rule of Evidence 704(b), the District Court sustained the Government's objection to this question, but overruled the objection to the first two bank fraud questions: "[T]he words 'affected' and 'affect,' in the context used, are vague and unclear, and to the extent that they request an opinion or inference as to 'whether defendant possessed a mental state or condition constituting an element of bank fraud,' objections are sustained. Otherwise, rulings as to relevance are deferred." *Id.* at 236–37.

The District Court sustained the Government's objections to four questions on mail and wire fraud, again invoking Rule 704(b). The questions were:

Q: In your opinion, to a reasonable degree of medical certainty, did Mr. Bennett's mental disorders preclude him from forming the specific intent to defraud individuals through the operation of the New Concepts program?

Q: If so, how?

Q: In your opinion, to a reasonable degree of medical certainty, did Mr. Bennett's mental disorders make it unlikely that he could defraud the individuals and entities involved with New Concepts?

Q: If so, how?

The District Court sustained all objections to the questions on false statements because the "questions do not relate to actual mens rea. They also appear to ask for impermissible opinion or inference in violation of Fed. R.Evid. 704(b)." *Id.* at 237. On the same basis, the District Court sustained objections to the questions about false tax returns, impeding the administration of the I.R.S., and money laundering.

In conjunction with its rulings on the proposed questions, the District Court issued a Memorandum explaining its decision:

The government's experts disagreed with most of the conclusions reached by defendant's experts....[The Government's disputes] are with a narrower approach to Rule 702 and as to Rule 403 admissibility. However, there is little evidence that defendant's experts performed their evaluations improperly or irregularly—or unscientifically. They may have been remiss in not looking into the economic operation of defendant's organization and ascertaining the enormity of its losses. Those matters could reflect on their assessment of defendant's condition as well as its relationship to his mens rea, both in clinical and legal terms....[I]t appears that the government's initial objections raise issues as to weight and not admissibility.

The relevance, scope, and form of the testimony of defendant's experts must also be decided. *[United States v. Pohlot*, 827 F.2d 889 (3d Cir.1987) ] teaches that evidence bearing on mens rea is admissible because it relates to an essential element of guilt. The mental state at issue is "actual" mens rea—which is not a matter of the individual's mental capacity but of the state of mind at the particular time in question. What is involved is a rule of evidence, not a defense. Relevance, therefore, depends on the legal ingredients, or definition, of the pertinent mens rea. Where mens rea includes specific intent or knowledge, it goes beyond mere conscious awareness of conduct. The question is whether the expert evidence, if believed,

would support a legally acceptable theory of lack of mens rea.

\* \* \*

The mental health expert may testify to the expert's examination and diagnosis and to other clinical information, such as the patient's history and the patient's version of what occurred, in order to give the jury information from which to determine whether actual mens rea was present. The mental health expert may not testify to the expert's opinion or inference on that issue, directly or by hypothetical question.

A further limitation is that under F.R.E. 702 the expert's testimony must assist the fact-finder. Here, the expert testimony relating to defendant's alleged delusion or fantasy regarding "anonymous donors" may be relevant to the mens rea for mail fraud. . . . However, before such evidence may surmount the F.R.E. relevance and F.R.E. 702 hurdles, it must be shown that, given the actual facts and circumstances, it supports a legally acceptable theory of lack of mens rea. The expert must be prepared to testify to information that supplies at least a partial basis for, or leads to, the logical finding that the mens rea—for example, in the case of mail fraud, the specific intent to defraud—was or may not have been present. Merely conclusory or speculative testimony is not enough.

The same probative value principle pertains to the expert testimony regarding defendant's belief that he was acting as God's agent. His experts drew the conclusion that since he considered himself to be carrying out God's will, he could not have possessed the requisite mens rea for commission of the crimes charged. Regardless of their validity, the expert's opinions or inferences as to defendant's mental state—in the legal sense—are barred by F.R.E. 704(b). However, the question remains as to the probative value of any expert testimony that defendant believed his actions were at God's behest. Motive is not an essential element of guilt and need not be proven by the government. The morality of one's conduct may be relevant to a legal insanity defense. But, by itself, moral rectitude, regardless of the

supremacy of the authority for such approbation, will not negate mens rea. Here, too, it is necessary for defendant to show how God's influence or direction fits into a legally acceptable theory that he lacked the state of mind at issue.

\* \* \*

As to each of the crimes charged in the present case, while the mens rea requirements vary, all of them involve some type of intentionally false representation. As a matter of law, no amount of honest belief that an enterprise will succeed—or is worthwhile—can justify false, baseless, or reckless assertions or promises.

\* \* \*

In order to have probative value as to mens rea, defendant's expert testimony must relate to the particular misrepresentations attributed to him in the indictment. If his clinical condition and symptomology can be logically connected to his subjective belief that his assertions were not false, baseless, or reckless visa-vis the truth, such evidence is admissible to show lack of mens rea. Otherwise, it is not—despite a strongly held religious conviction, whether or not arising from mental disorder, that his conduct was morally upright and would be societally beneficial.

\* \* \*

For a mental health expert's testimony to have probative value as to statutory willfulness, it must have some bearing, in factual terms, on the issue of whether there was a voluntary, intentional violation of a known legal duty. The generalized conclusion, without more, that defendant believed he was doing God's work is not sufficient to negate the mens rea of statutory willfulness. What it tends to prove—the morality or goodness of defendant's conduct—is not necessarily inconsistent with a guilty mens rea. It does not by itself tend to show that the alleged violation, here the filing of false tax returns, was not voluntary or intentional or was not a violation of a known legal duty.

Inasmuch as the rulings on relevance objections have been deferred, defendant will be given a further opportunity, within

the guidelines set forth in this memorandum, to develop the mental health theory of his case. It is not necessary for the mental health expert's testimony to provide the fact basis for defendant's theory or theories in their entirety or even large part. But the testimony must show some Rule 401 or Rule 702 connection to the lack of actual mens rea for the particular crime charged in the indictment.

*United States v. Bennett,* 29 F.Supp.2d 236, 238–41 (E.D.Pa.1997) (Memorandum) (citations omitted).

### B. Propriety of Pretrial Rulings Concerning Expert Testimony

Bennett argues the District Court erred in ruling his proffered psychiatric evidence was inadmissible under Federal Rule of Evidence 704(b), which forbids experts from stating an "opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." Fed. R.Evid. 704(b). Bennett maintains the proffered questions did not call for such an opinion or inference, but sought admissible evidence of whether Bennett: (a) harbored the specific intent to defraud; (b) knew and believed that the tax returns and other information given to the IRS were false; (c) knew the money he handled represented the proceeds of criminal activity (as is required under the money laundering statute); or (d) harbored the specific intent to promote illegal activity.

■■■ We review the District Court's rulings on the admissibility of expert testimony for abuse of discretion. *See United States v. McGlory,* 968 F.2d 309, 345 (3d Cir.1992); *Habecker v. Copperloy Corp.,* 893 F.2d 49, 51 (3d Cir.1990). We note the trial judge has broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trial of fact. *See* Fed.R.Evid. 702; 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[2] (Joseph M. McLaughlin ed., 2d ed. 1997) ("The trial judge has broad discretion to admit or exclude expert testimony under the test of 'helpfulness'. . . . In determining the

admissibility of expert evidence, the trial judge must also consider whether the general relevancy requirements of Rules 401–403 are met.").

Rule 704 provides:

**Opinion on Ultimate Issue**

(a) Except as provided in subdivision (b), testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone.

Fed.R.Evid. 704. The accompanying advisory committee's note states:

The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.

\* \* \*

The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

Fed.R.Evid. 704 advisory committee's note.

■■■ Rule 704 prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *United States v. Morales,* 108 F.3d 1031, 1037 (9th

Cir.1997). Therefore, expert testimony is admissible if it merely "support[s] an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony." *Id.* at 1038 (allowing expert testimony that a defendant charged with willfully making false entries in a union ledger had a weak grasp of bookkeeping principles, because to hold otherwise "would exclude an expert's opinion on any matter from which the factfinder might infer a defendant's mental state").[4]

Nonetheless, "[c]ourts have interpreted Rule 704(b) to prohibit both the prosecution and the defense from inquiring of expert psychiatrists whether the defendant, at the time of the crime, was able to appreciate the wrongfulness or the nature and quality of his acts." *United States v. Brown,* 32 F.3d 236, 238 (7th Cir.1994); *see also United States v. West,* 962 F.2d 1243, 1246 (7th Cir.1992) (holding that Rule 704 forbids psychiatric testimony as to whether defendant charged with bank robbery understood the wrongfulness of his act at the time of the offense).

■ We believe the District Court properly excluded the questions asking whether Bennett's mental disorders (1) "precluded him from forming the intent to defraud"; (2) made it "highly unlikely that he could form the intent to defraud"; (3) made it "unlikely that he would have engaged in conduct designed to defraud"; (4) precluded him "from forming the specific intent to defraud individuals"; (5) made it "unlikely that he could defraud the individuals and entities"; (6) "affect[ed] his ability to knowingly and willfully submit false statements to the I.R.S."; and

(7) made "it unlikely that he would knowingly and willfully submit false statements to the I.R.S." These questions go beyond merely assisting the jury, explaining the nature of Bennett's mental disease, or describing the typical effect of Bennett's disorders on his mental state. Instead, they require the expert witness to state expressly whether Bennett possessed the requisite intent to commit the crimes charged in the indictment. Accordingly, we find no abuse of discretion in the District Court's refusal to admit the questions.

In his argument to the contrary, Bennett relies principally on *United States v. Hayden,* 64 F.3d 126 (3d Cir.1995), *United States v. Theodoropoulos,* 866 F.2d 587 (3d Cir. 1989), and *United States v. Pohlot,* 827 F.2d 889 (3d Cir.1987), all of which allowed the introduction of expert testimony on the defendant's mental condition at the time of the offense. In all three cases, however, the proffered testimony was limited to a factual description of the defendant's mental capacity, without any opinion or inference as to whether the defendant had the mental state required for commission of the offense.

In *Hayden,* the defendant had been convicted of receiving a firearm while under a felony information, in violation of a statute punishing those who "willfully violate[ ]" its provisions. 18 U.S.C. § 924(a)(1)(D) (1988 & Supp. V 1993). While completing forms for the purchase of the firearm, the defendant had responded "no" to a question asking whether he was "under indictment or information." *Id.* at 127. In fact, the defendant was under a criminal information for receiving stolen property, and he acknowledged having received a copy of the information in the mail. At trial, the District Court pre-

---

**4.** *See also United States v. Levine,* 80 F.3d 129, 134 (5th Cir.1996) (noting that a majority of circuits find that "hypothetical questions mirroring the fact patterns of the evidence in the trial case [violate Rule 704(b)] when the answering testimony contains a necessary inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto"); *United States v. Richard,* 969 F.2d 849, 854–55 (10th Cir.1992) ("Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's actual mental

state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state."); *United States v. Foster,* 939 F.2d 445, 454 (7th Cir.1991) (allowing expert testimony that "merely assisted the jury in coming to a conclusion as to [defendant's] mental state; it did not make that conclusion for them"); *United States v. Dunn,* 846 F.2d 761, 762 (D.C.Cir.1988) ("It is only as to the last step in the inferential process—a conclusion as to the defendant's mental state—that Rule 704(b) commands the expert to be silent.").

vented the defendant's expert witness from testifying the defendant had low intelligence and poor reading skills.

In reversing, we held such evidence was relevant to determine whether the defendant's failure to provide truthful information on the form was "willful," as required by the statute. *See id.* at 134 (holding that "the government must prove Hayden knew or deliberately disregarded the fact that he was under an information and that his purchase of a firearm was therefore unlawful" and "the excluded evidence had a direct bearing on willfulness"). Accordingly, we remanded for a new trial but specifically instructed that "[a]ny use of expert testimony on remand must, of course, comply with Federal Rule of Evidence 704(b)." *Id.* at 134 n. 13.

In *Theodoropoulos*, we assessed the testimony of an FBI cryptanalyst who translated code words used in intercepted conversations and testified about his inferences of the roles played by the individual defendants in a drug trial.[5] We held this testimony did not "fall within the narrow range of opinions still prohibited under Rule 704 .... [because it consisted of] factual conclusions rather than opinions." *Theodoropoulos*, 866 F.2d at 591 (citing, *inter alia, United States v. Brown*, 776 F.2d 397, 400–02 (2d Cir.1985) (holding expert testimony that defendant was a "steerer" in a drug organization was admissible)).

Finally, in *Pohlot* we considered "what, if any, evidence of a criminal defendant's mental abnormality is admissible to prove the defendant's lack of specific intent to commit an offense, following the passage of the Insanity Defense Reform Act of 1984." *Pohlot*, 827 F.2d at 890.[6] The defendant had been charged with using interstate commerce facilities in a plot to murder his wife. At trial, his psychiatric expert testified at length about the defendant's emotional development, his history of abuse by his wife, and

his supposed feeling that the murder plot was an elaborate fantasy. *See id.* at 892. But the expert did not express an opinion whether the defendant had the requisite intent to be guilty of the crime charged. We concluded the Insanity Defense Reform Act barred admission of evidence of mental abnormality to support a diminished capacity or diminished responsibility defense, but did not bar admission of such evidence to negate an element of mens rea:

> [A]lthough Congress intended § 17(a) to prohibit the defenses of diminished responsibility and diminished capacity, Congress distinguished those defenses from the use of evidence of mental abnormality to negate specific intent or any other mens rea, which are elements of the offense. While the contours of the doctrines of diminished responsibility and diminished capacity are unclear, the defenses that Congress intended to preclude usually permit exoneration or mitigation of an offense because of a defendant's supposed psychiatric compulsion or inability or failure to engage in normal reflection; however, these matters do not strictly negate mens rea.

Despite our disagreement with the government's broad contention [that the Act barred all evidence of mental abnormality from the jury's consideration of mens rea], we agree that the Congressional prohibition of diminished responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

---

5. We note that *Theodoropoulos* was overruled on other grounds by *United States v. Price*, 76 F.3d 526 (3d Cir.1996).

6. The Insanity Defense Reform Act of 1984 provides in part:
 (a) **Affirmative Defense.**—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of

the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality of the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.
18 U.S.C.A. § 17 (West Supp.1998).

*Id.* at 890. Therefore, "[d]istrict courts should admit evidence of mental abnormality on the issue of mens rea only if when, if believed, it would support a legally acceptable theory of lack of mens rea." *Id.* at 905–06.[7] We upheld Pohlot's conviction because even if the psychiatric testimony were credited, it did not negate a finding of specific intent. *See id.* at 906–07.

Unlike the defendants in *Hayden, Theodoropoulos,* and *Pohlot,* Bennett sought to introduce expert testimony expressly stating that he lacked the mental capacity to commit the charged crimes. All of the excluded questions asked the expert to state, in conclusory terms, how Bennett's mental disorders affected his criminal culpability. That decision is exclusively within the province of the jury. We find no abuse of discretion in the District Court's decision to exclude the proposed testimony.

### C. Sentencing Issues

Bennett maintains the District Court erred during sentencing in failing to make specific findings of fact and resolve disputed issues as required by Federal Rule of Criminal Procedure 32(c)(1). That Rule provides:

(1) **Sentencing Hearing.** At the sentencing hearing, the court must afford counsel for the defendant and for the Government an opportunity to comment on the probation officer's determinations and on other matters relating to the appropriate sentence, and must rule on any unresolved objections to the presentence report. The court may, in its discretion, permit the parties to introduce testimony or other evidence of the objections. For each matter controverted, the court must make either a finding on the allegation or determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing. A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.

Fed.R.Crim.P. 32(c)(1). The accompanying advisory committee note provides:

Subdivision (c)(1) is not intended to require that resolution of objections and imposition of sentence occur at the same time or during the same hearing. It requires only that the court rule on any objections before sentence is imposed.... The rule speaks in terms of the court's discretion, but the Sentencing Guidelines specifically provide that the court must provide the parties with a reasonable opportunity to offer information concerning a sentencing factor reasonably in dispute.

\* \* \*

Subdivision (c)(1) (formerly subdivision (c)(3)(D)) indicates that the court need not resolve controverted matters which will "not be taken into account in, or will not affect, sentencing." [T]he words "will not affect" did not exist in the former provision but were added in the revision in recognition that there might be situations, due to overlaps in the sentencing ranges, where a controverted matter would not alter the sentence eve if the sentencing range were changed.[8]

Fed.R.Crim.P. 32 advisory committee's note.

### 1. Consideration of the Sentencing Memorandum

■ Initially, we must decide whether to consider the Sentencing Memorandum filed

---

**7.** *Pohlot* mentioned Rule 704(b), albeit briefly, in dicta:

[T]he Senate Judiciary Committee wished to abolish only diminished responsibility and capacity defenses not to abolish the use of psychiatric evidence to disprove mens rea.

A later portion of the Senate Report confirms this view of the Committee's intent. In addition to changing the insanity defense, the Insanity Defense Reform Act altered Federal Rule of Evidence 704 to prevent psychiatric experts from providing opinions on ultimate issues. The Report explained: "The Committee has fashioned its Rule 704 provision to reach all such ultimate issues, e.g., *premeditation in a homicide case,* or lack of predisposition in entrapment." Premeditation is, of course, an element of mens rea. If the Judiciary Committee had intended § 17(a) to prevent psychiatrists from testifying about mens rea at all, its report would almost certainly not have indicated its approval of psychiatric evidence on mens rea.

*Id.* at 898–99 (citations omitted).

**8.** *See United States v. Singh,* 923 F.2d 1039, 1044 (3d Cir.1991) ("Rule 32 requires the judge, as a

by the District Court after Bennett had appealed his sentence. As noted, the District Court made oral findings of fact at the sentencing hearing and expressly adopted the findings of the Presentence Investigation Report in its judgment order. The Sentencing Memorandum contains a more comprehensive explanation of the District Court's factual findings and conclusions of law with respect to the issues contested on this appeal. *See United States of America v. Bennett,* 9 F.Supp.2d 513 (E.D.Pa.1998) (Sentencing Memorandum). Although we do not condone late filing, we will nonetheless consider the Sentencing Memorandum.

Bennett argues consideration of the Sentencing Memorandum would violate our Local Rules of Appellate Procedure and could unfairly prejudice his case. Local Rule of Appellate Procedure 3.1 provides, in part:

**Notice To Trial Judge; Opinion In Support Of Order**

At the time of the filing of a notice of appeal, the appellant shall mail a copy thereof by ordinary mail to the trial judge. Within 15 days thereafter, the trial judge may file and mail to the parties a written opinion or a written amplification of a prior written or oral recorded ruling or opinion.

3d Cir. R. 3.1. Notably, the accompanying comments suggest a flexible approach is consistent with the spirit of the rule: "A District Court may properly prepare an opinion or memorandum explaining a decision after an appeal is taken. The rule is not intended to inhibit or discourage District Courts from preparing opinions as they presently do. To the contrary, the rule was designed to provide more flexibility." 3d Cir. R. 3.1 committee comments.

The District Court filed its Sentencing Memorandum long after the 15–day window of Local Rule 3.1 had expired.[9] Bennett does not ask that we strictly enforce the rule's 15–day limit, but proposes instead a bright-line rule forbidding consideration of any District Court opinion filed less than 30 days before the due date for the appellant's brief. He advocates 30 days because "that is the shortest period of time under this Court's practice that an appellant is deemed to need to prepare the opening brief." (Appellant's Post–Argument Letter Br. at 4.) Thus, Bennett argues a 30–day rule would fulfill Local Rule 3.1's purpose of ensuring that appellants are not prejudiced by post-appeal clarifications of rulings in response to the appellant's formulation of issues and the identity of the panel.

Although Bennett's argument carries some appeal, we decline to adopt a bright-line rule. Instead we will look to the nature of the supplemental memorandum and whether its consideration would prejudice the defendant. In this case, we believe the Sentencing Memorandum is a helpful amplification of the District Court's sentencing decisions and its consideration will not prejudice Bennett. Bennett concedes the District Court did not alter or clarify its rulings to address the arguments raised in his appellate brief or cater to the identity of the panel. Nor was Bennett prejudiced by a lack of opportunity to address the content of the Sentencing Memorandum, since we allowed both parties to submit supplemental briefs on whether we should accept the Sentencing Memorandum and to respond to its content. Thus we fail to see how consideration of the Sentencing Memorandum could prejudice Bennett.

Finally, we note that even in the absence of the Sentencing Memorandum, we believe

predicate for sentencing, either to resolve all disputes as to facts recited in the presentence report, or to make clear that the matters in dispute will not be a factor in sentencing."); *United States v. Furst,* 918 F.2d 400, 408 (3d Cir.1990) ("[Rule 32] directs the District Court, as to each matter converted, either expressly to disclaim reliance upon the matter or to make a finding as to the allegation."); *United States v. Rosa,* 891 F.2d 1063, 1070 (3d Cir.1989) ("[T]he purpose of Rule 32 will not be fulfilled unless the court either resolves the dispute or expressly disavows reliance on the disputed information.").

9. After being sentenced in September 1997, Bennett filed a notice of appeal on October 2, 1997, and his brief to this Court on February 24, 1998. The government filed its brief on April 15, 1998 and Bennett filed a reply brief on May 21, 1998. Both parties based their arguments on the presentence report and the District Court's findings as reflected in the transcript of the sentencing hearing. Thereafter, on May 28, 1998, the District Court filed the Sentencing Memorandum.

the District Court's explicit adoption of the factual findings in the presentence report, along with its own factual findings and legal conclusions at the sentencing hearing, were sufficient. Accordingly, we will consider the Sentencing Memorandum as an amplification of the District Court's sentencing decisions.

## 2. The Sentencing Memorandum

The Sentencing Memorandum focuses largely on the enhancements applied. On the calculation of the "amount of loss" for purposes of U.S.S.G. § 2F1.1(b)(1)(S), the Sentencing Memorandum explains:

> The government's evidence demonstrated that the offense conduct was commenced in 1988–89 with check-kites that permitted defendant to pay off old loans with monies received from new investors.... [T]he New Concepts program was begun as a check-kite/"Ponzi" scheme to cover cash shortages in defendant's then companies, and the scheme grew, in the form of a pyramid, as the base of investors widened. There was no collateral or other safety net to prevent the ultimate—predictable—catastrophic loss. Moreover, the huge presentence restitution to the victims resulted from the considerable efforts of many individuals other than defendant. The loss was calculated to be in excess of $100 million based on the undisputed evidence as to the amount owed investors when New Era collapsed. Given the alternatives, that figure best approximated the extent of loss attributable to the New Concepts matching program. Because the amount was greater than $80 million, the upper limit of the highest Guideline's bracket for amount of loss, 18 levels, were added.

*Bennett,* 9 F.Supp.2d at 519–20 (citations omitted).

Next, the District Court explained its decision to enhance Bennett's base offense level by two levels because of Bennett's misrepresentation that he was acting on behalf of a charitable organization:

> In the opinion of New Era's tax counsel it was "important and appropriate" that the New Concepts program be disclosed on New Era's applications for tax-exempt sta-

tus. Nevertheless, there was no reference to it on either New Era's application for federal 501(c)(3) exemption or the application for Pennsylvania charitable organization. Nor were inter-connected relationships between defendant's for-profit and not-for-profit entities disclosed. In October, 1994 an I.R.S. agent was sent to New Era to investigate the existence of a suspected Ponzi-like scheme. At that audit, defendant himself represented that there was no matching program. At sentencing, defendant admitted having concealed the matching program from the I.R.S.

> Defendant's claim that he was unaware of New Era's financial operations is incomprehensible and not credible. The staff consisted of a handful of individuals all of whom were responsible to defendant and supervised by him. When called as government witnesses, their testimony portrayed him to be a micro-manager of the programmatic and financial activities of New Era as well as of the other entities that were subject to his control. He was an active and forceful CEO who created and organized his companies in his own image. He put together the programs, laid out all policies and directed their implementation, and selected personnel. He retained and conferred with attorneys and accountants. He solicited and met with representatives of potential investors—and made or approved all major corporate decisions.

> At defendant's direction, New Era misrepresented or withheld information essential to its tax exempt status. As related in unrebutted testimony, defendant falsely conveyed to his own staff and to corporate counsel, as well as the public, that there was a board of directors. However, there were no directors other than defendant, although from time to time he talked about appointing them. As one of his attorneys testified, an I.R.S. requirement for tax-exempt status is the existence of a genuine board of directors. Another conceded that although defendant submitted to the I.R.S. a list of board members, in actuality none of the documents concerning the board "matched up"—causing the attorney to be

concerned. Ironically, in a lecture series conducted by him, defendant admonished charitable organizations about the importance of a board of directors and of proper record-keeping for I.R.S. purposes. Credible evidence was received at sentencing that to satisfy the 1994 I.R.S. audit, defendant had dictated and submitted fictitious minutes of board meetings for 1992 and 1993.

Defendant's misrepresentations allowed New Era to present itself as a legitimate, tax-exempt foundation and facilitated the success of its illegal operation.

*Id.* 9 F.Supp.2d at 520–21 (citations omitted).

The Sentencing Memorandum also describes how Bennett "affected a financial institution" and derived more than one million dollars in gross receipts, resulting in an enhancement under U.S.S.G. § 2F1.1(b)(6)(B):

The offense "affected a financial institution" in that defendant maintained personal and New Era accounts at several financial institutions, including Founder's Bank, the National Bank of the Main Line, and Prudential Securities.

Defendant's "gross receipts" took two forms. One consisted of payments directly from New Era—money that came almost entirely from the New Concepts matching program. The other involved expenditures made for the benefit of defendant or his family.

Evidence showed that during the operation of New Era, there were transfers in excess of $4 million to defendant's personal accounts or to those of his for profit companies. In the words of a government auditor, $4,208,637 was transferred from New Era to "entities in which 100 percent interest is to John G. Bennett, Jr." This total corresponded with the report of defendant's accountant less $800,000 credit for pre-collapse returns of previously transferred assets. Accepting defendant's figures, the amount still exceeds $3 million.

As to the expenditures that benefitted defendant or his family, it was proven that more than $2 million went directly to defendant's personal expenses and investments, including the purchase of a house, travel, loans, an expensive car, and transfers of money through for-profit company accounts.

As computed by the government auditor, the total of salary paid defendant, together with payments to his family members, Main Line Travel Agency, Merrill Lynch Investments, a Lexus dealership, personal credit card accounts, and for baseball tickets came to $2,449,960.

*Id.* 9 F.Supp.2d at 521 (citations omitted).

The District Court also applied a four-level enhancement for Bennett's role in the offense. The Sentencing Memorandum explains this decision, characterizing Bennett's role as an organizer or leader of a criminal activity that was "otherwise extensive" within the meaning of U.S.S.G. § 3B1.1(a).

In this action, there appears to have been just one other "criminal participant," an accountant. The application of the enhancement rests on the "otherwise extensive" prong.

Andrew Cunningham, one of the outside accountants, pleaded guilty in this court to fraud in relation to his accounting work for New Era. In 1994, Cunningham became suspicious and asked defendant about several matters, including payments from New Era to defendant's for-profit consulting firm (Bennett Group International); fabricated minutes of board meetings presented to the I.R.S.; and lack of documentation to support the matching program. Some time after these inquiries, Cunningham informed defendant that he himself was in financial difficulty and needed about $50,000. Defendant promptly agreed to give him that amount and said: "I guess this means there won't be any more hard questions." According to his testimony at defendant's sentencing, Cunningham felt that he had been "bought." From then on, when asked critical questions about New Era's activities, he falsified his answers. Cunningham became a criminal participant working at defendant's direction.

However, defendant also used a number of ostensibly innocent individuals to facilitate the operation of the matching program, rendering the activity "otherwise extensive." [Seven New Era employees

worked under his direction] ... Each performed a job that related and contributed to the overall scheme.

As an illustration—defendant's assistant, acting at his behest, did not give the monthly "payment schedules" to New Era's lawyers and accountants who had asked for them. She also withheld the list of New Era's board members. Defendant utilized the services of several respected outside attorneys and accountants. Their work products, which gave defendant's companies the imprimatur of legality and reliability, reflected the carefully delimited information supplied to them by defendant. Moreover, he specifically directed Prudential Securities employees who handled investor inquiries not to divulge the non-segregated nature of these so-called "escrow" accounts.

Since none of these individuals would appear to have acted with knowledge of New Era's illegal activities, they do not bear "equal responsibility" with defendant for his conduct. Contrary to defendant's view, the enhancement was not based on defendant's position as president and sole director of New Era. Instead, the evidence supports the application of the enhancement because defendant led or directed one criminal participant and at least 13 innocent individuals to assist in the commission of the crimes for which he was indicted.

*Id.* 9 F.Supp.2d at 522–23 (citations omitted).

The District Court further explained its decision to enhance Bennett's offense level for abusing "a position of trust" in a way that "significantly facilitated" the commission of a crime. U.S.S.G. § 3B1.3. The Sentencing Memorandum states:

As regards the nonprofit organizations and individuals who invested or donated money to be "matched," New Era and defendant occupied positions of trust as fiduciaries. Additionally, as its lone director, defendant had a fiduciary relationship with New Era. When defendant caused significant misrepresentations to be made in order to secure and maintain New Era's "tax exempt" status, defendant violated his fiduciary duties both to the public and to New Era.

Next, as the government proved, defendant used these positions of trust to enable the perpetration of crimes. While defendant may have been impelled by his intense hopes to "Save the World," he not only was aware that monies were entrusted to New Era, but he also took fraudulent steps to develop and encourage that trust. Defendant's letter to prospective individual investors of January 1995 enclosed an informational manual about New Concepts and referred investors and donors to New Era's form 990 and state due-diligence registration. This is just one instance in which defendant knowingly disseminated material misrepresentations that were undeniably false.

To say that investors were greedy and, therefore, took their chances is but a half, self-serving truth. As a Guidelines Commentary aptly observes: "Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct." Similarly, the argument that others, such as Prudential Securities, the accountant, Andrew Cunningham, and counsel helped lead defendant down the garden path, must also be flatly rejected. That reputable professionals, at his request, assisted him in carrying out these offenses hardly diminishes his role in them. If anything, the more cogent conclusion is to the contrary.

As repletely shown by the evidence, defendant knowingly, purposefully, and repeatedly misrepresented the nature and characteristics of the matching program in order to market it and effectuate large scale participation. At its outset, he claimed that there was an "anonymous benefactor" whose giving made the program feasible. Later, as he admitted, New Era distributed to organizations across the United States and, eventually, in England, prospectus-type literature asserting that the "original" benefactor was "extremely pleased" with the progress of the program.

Acting at defendant's sole direction, the Foundation constantly borrowed against and invaded funds that investors had deposited to be held, doubled and returned—

not encumbered or spent. Defendant assured potential investors that their money would be held for them in accounts at Prudential Securities. Nevertheless, as testified to by Prudential employees, all money received was put into a single "command account," which was under defendant's total control and in which funds were merely designated "F.B.O."—"for the benefit of"—the investing organization. Defendant explained to investors that they money would have to be held in "escrow" for set periods of time because of the "anonymous benefactors" purported instructions. But as defendant well knew, all the funds received by New Era were commingled and were transferred, at his discretion, to cover shortfalls and to make other improper payments. These various dealings constituted fact-specific knowing abuses of trust.

*Bennett,* 9 F.Supp.2d at 523–24 (citations omitted).

Finally, the District Court reiterated its refusal to grant a two-level downward adjustment for acceptance of responsibility:

Here, although conceding his knowledge of the occurrence of many of the transactions forming the fact basis of the charges and accepting personally responsibility for them, defendant disavowed having any criminal intent. He denied knowledge of account balances or of checks signed by him, of tax forms that he signed, and of giving his accountants a fabricated list of board members to be submitted to the I.R.S. He disclaimed any wrongdoing. Even if the "anonymous benefactors" had actually existed, that position is untenable, given defendant's numerous admitted misrepresentations of material facts and his unauthorized use of investor's monies. He cannot be said to have clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct, as required by § 3E1.1. Instead, he demonstrated a non-recognition and non-acceptance of personal responsibility.

*Id.* 9 F.Supp.2d at 524 (citations omitted).

### D. Resolution of Sentencing Issues

■ Bennett argues the District Court erred in imposing: (1) a two-level increase in the offense level for Bennett's misrepresentation of acting on behalf of a charity; (2) a four-level increase for deriving more than $1 million from a fraud offense that affected a financial institution; (3) a four-level increase for Bennett's role leadership role in the offense; (4) a two-level increase for his abuse of a position of trust; and (5) no reduction in the offense level for Bennett's acceptance of responsibility. When reviewing the imposition of a sentence under the federal sentencing guidelines, "the District Court's findings of facts are measured by the clearly erroneous test, but our review of the legal component of its conclusion is plenary." *United States v. Hillstrom,* 988 F.2d 448, 450 (3d Cir.1993); *see also United States v. Bush,* 56 F.3d 536, 537–38 (3d Cir.1995).

### 1. Misrepresentation of Acting on Behalf of a Charity

■ As noted, the District Court imposed a two-level enhancement under U.S.S.G. § 2F1.1(b)(3)(A) for Bennett's misrepresentation of acting on behalf of a charity. Bennett argues the District Court failed to make proper factual findings in response to his objections that (1) he never falsely represented his authority to act as an agent or employee of the New Era organizations; (2) the New Era organizations were bona fide; and (3) there is insufficient evidence to prove the New Era organizations were frauds from their inception or that Bennett intentionally provided false information to or deceived either the I.R.S. or other government agencies.

We believe the District Court's fact-finding supports application of the adjustment. The presentence report found that Bennett secured a favorable I.R.S. rating for New Era by submitting fraudulent documentation that failed to reveal the New Concepts Program, he enticed participants to provide funds with false statements that anonymous donors would match their donations, and he used New Era's charitable image to divert funds to private businesses. The District Court adopted these findings and determined that Bennett's conduct caused a loss of over $100 million. The court also recited the presen-

tence report's determination that Bennett diverted many of these funds to his personal use, in direct violation of his promise to hold the money in escrow until it was matched by the alleged anonymous donor. Bennett did all of this under the pretense of running a legitimate charitable organization.

■ Bennett also argues that as a matter of law, the adjustment applies only when a defendant falsely claims to be soliciting on behalf of a genuine charity with which the defendant has no connection, solicits on behalf of a fictitious charity, or uses a position as the actual representative of a genuine charitable organization to embezzle money. According to Bennett, the adjustment does not apply here because the Foundation for New Era Philanthropy was a genuine "charitable organization" and Bennett actually acted on its behalf at all times.

■ We disagree with this narrow interpretation of the enhancement. The guideline provides that if the offense involved "misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a government agency ... increase by 2 levels." U.S.S.G. § 2F1.1(b)(3)(A). The application note states:

> Examples of conduct to which this factor applies would include a group of defendants who solicit contributions to a nonexistent famine relief organization by mail, a defendant who diverts donations for a religiously affiliated school by telephone solicitations to church members in which the defendant falsely claims to be a fund raiser for the school, or a defendant who poses as a federal collection agent in order to collect a delinquent student loan.

U.S.S.G. § 2F1.1 cmt. (n.4). This list of examples is illustrative, not exhaustive. *See United States v. Ferrera,* 107 F.3d 537, 541 (7th Cir.1997) ("[T]he commentators could not have intended these examples to be exhaustive, and as a practical matter, these examples could not be exhaustive, as the devious mind would easily escape that limited

net.") (citation omitted). *But see United States v. Frazier,* 53 F.3d 1105, 1113 (10th Cir.1995) (noting that the hypotheticals "demonstrate that the purview of the guideline is narrower than that which may be discerned from a literal reading of the guideline").

■ The background commentary to the fraud guideline instructs:

> This guideline is designed to apply to a wide variety of fraud cases.... Use of false pretenses involving charitable causes and government agencies enhances the sentences of defendants who take advantage of victims' trust in government or law enforcement agencies or their generosity and charitable motives. Taking advantage of a victim's self interest does not mitigate the seriousness of fraudulent conduct. However, defendants who exploit victims' charitable impulses or trust in government create particular social harm.

U.S.S.G. § 2F1.1 cmt. (backg'd).[10] Furthermore, "that the victims may not have wholeheartedly believed [defendant's] representations and sought independent verification does not mitigate the seriousness of [defendant's] conduct. Rather, the focus of our inquiry must be on the defendant's motivation for making the prohibited representation." *Ferrera,* 107 F.3d at 541.

Assuming the Foundation for New Era Philanthropy constituted a genuine charitable organization in some respects, it is clear Bennett used his position there to ensnare donors with falsehoods designed to generate contributions. He exploited his victims' altruism to reap personal, pecuniary gain. We find no authority for the proposition that the enhancement applies only if the "charitable" organization is fraudulent from its inception and in every facet of its operations. Nor does it matter that many of Bennett's victims acted at least partially out of self interest. *See id.* Regardless of their motivation in giving money to New Era, donors had a right to expect that their contributions would be

---

**10.** *See Stinson v. United States,* 508 U.S. 36, 38, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it

violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

used in the manner that Bennett had promised.[11]

In response, Bennett relies largely on the Tenth Circuit's decision in *United States v. Frazier*, cited above. Frazier was the president of a non-profit corporation that provided technical and social services to Native Americans. He was indicted for, *inter alia*, misusing government funds and making false statements to a government agency. The Tenth Circuit held that an enhancement for misrepresentation of acting on behalf of a charity was not warranted, because the enhancement applies only when a defendant exploits victims' generosity and charitable motives by misrepresenting one's authority. *Frazier* therefore limits application of U.S.S.G. § 2F1.1(b)(3)(A) to defendants who falsely represent they have authority to act on behalf of a charitable, religious, educational, or political organization. *See id.* at 1114 n. 7 (citing *United States v. Starr*, 986 F.2d 281, 282–83 (8th Cir.1993)).

The facts of this case are quite different. The defendant in *Frazier* "did not affirmatively solicit contributions from the public, but rather [misapplied government funds]," "did not exploit the 'generosity' and 'charitable motives' of his victim," and "did not solicit funds the purpose of which was, at least in part, to serve his *own personal interest*." *Frazier*, 53 F.3d at 1114; *see also Smith*, 133 F.3d at 744 (noting Frazier "used grant funds for unauthorized purposes, but did not 'appeal to the generosity and charitable or trusting impulses of his victim' ") (citation omitted); *Ferrera*, 107 F.3d at 542 & n. 4 (distinguishing *Frazier* on the same grounds). In contrast, Bennett actively solicited contributions from individuals and organizations, exploiting their charitable impulses to extract donations that were eventually funneled to his for-profit businesses and personal use. Surely these donors would not have contributed the funds had they known the true nature of New Era: namely, that it was an organization premised on falsehoods and serving as a vehicle for Bennett's personal gain.

We conclude the District Court properly applied a two-level enhancement for Bennett's misrepresentation that he acted on behalf of a charity.

### 2. Affecting a Financial Institution

 The District Court applied a four-level enhancement because Bennett derived more than $1 million in gross receipts from an offense that affected a financial institution. Bennett argues the District Court failed to make specific factual findings to support application of this enhancement.

U.S.S.G. § 2F1.1(b)(6)(B) provides: "If the offense ... affected a financial institution and the defendant derived more than $1,000,-000 in gross receipts from the offense, increase by four levels. If the resulting offense level is less than level 24, increase to level 24." The accompanying application note explains "gross receipts from the offense" generally means "that the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000. 'Gross receipts from the offense' includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense." U.S.S.G. § 2F1.1 cmt. (n.16); *see United States v. Kohli*, 110 F.3d 1475, 1477 (9th Cir.1997) ("Application note 16 confirms the broad sweep of this guideline.").

 The guideline requires only (1) that the offense "affected a financial institution," and (2) that the defendant "derived more than $1,000,000 from the offense." U.S.S.G. § 2F1.1(b)(6)(B). It applies "even if the defendant receives the million dollars in an indirect manner." *United States v. Monus*, 128 F.3d 376, 397 (6th Cir.1997); *see also Kohli*, 110 F.3d at 1477 ("The critical factor

11. *See, e.g., United States v. Smith*, 133 F.3d 737, 741 (10th Cir.1997) (approving enhancement where defendant obtained contributions as telephone solicitor for a bogus organization supposedly devoted to helping children stay off drugs where the organization actually retained collected funds); *Ferrera*, 107 F.3d at 541 (affirming enhancement where defendant issued falsified promissory notes purportedly guaranteed by the Mexican government and falsely claimed to be a prominent figure in the Mexican military and government); *United States v. Marcum*, 16 F.3d 599, 603 (4th Cir.1994) (upholding enhancement for defendant who skimmed proceeds from bingo games conducted on behalf of a charitable organization).

in the application of this enhancement is that it turns on the culpability of the individual defendant."). The offense need only "affect" a financial institution to qualify for the adjustment; it does not have to jeopardize the soundness of the institution. *See United States v. Wilson,* 41 F.3d 399, 401 (8th Cir. 1994) (finding "no qualification indicating that Congress sought to punish such conduct only when the safety and soundness of a financial institution was jeopardized").

■ We believe Bennett's offense met these criteria. Both the presentence report and the District Court expressly found that Bennett personally derived more than $1 million from his criminal conduct. This finding was fully supported by the evidence. Bennett's forensic accountant and the government's expert agreed that Bennett transferred $4,280,637 to businesses in which he possessed a 100 percent interest. Reducing this amount by the $800,000 that Bennett returned after being caught, the gross receipts still far exceed $1 million. Bennett's expert nevertheless concluded that Bennett did not receive all of these funds "individually" because he subsequently transferred much of the money to consultants and others who did work for New Era. But it is irrelevant how Bennett spent the money after he obtained it. *See United States v. Wong,* 3 F.3d 667, 668 (3d Cir.1993) (holding that " 'gross receipts from the offense' includes all property which is obtained either directly or indirectly as a result of the offense"). The District Court did not err in finding Bennett individually derived more than $1 million from his offense.

We also find support for the District Court's conclusion that the offense affected several financial institutions, most directly Prudential Securities. As the presentence report and the Sentencing Memorandum note, Bennett obtained a $50 million loan for New Era from Prudential and used his account there to facilitate the offenses. He

then defrauded investors by telling them their funds were deposited in Prudential "quasi-escrow" accounts. In the aftermath, the bankruptcy trustee sued Prudential for over $150 million. Prudential ultimately agreed to pay $18 million to settle litigation resulting from the collapse of the New Era organizations and suffered negative publicity that harmed its reputation.[12]

The District Court expressly adopted these findings from the presentence report. It also expressly found at the sentencing hearing that Bennett individually derived more than $1 million from offenses affecting a financial institution. We believe these findings were more than adequate to support application of the enhancement.

### 3. Leadership Role in the Offense

■ According to Bennett, the District Court made only conclusory findings to support its decision to enhance his base offense level for being an organizer or leader of a criminal activity under U.S.S.G. § 3B1.1(a). Bennett further claims the District Court failed to identify individuals Bennett organized, supervised, and managed, or the offenses in which these individuals participated, and failed to determine whether Bennett's accountant Andrew Cunningham was a culpable participant in the criminal activity.

■ The Sentencing Guidelines provide: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." If the defendant was a "manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." U.S.S.G. § 3B1.1(b). Thus, the sentencing court should enhance the more culpable offenders' levels "so long as there were five or more participants *or* so long as the criminal

---

12. *See, e.g., Monus,* 128 F.3d at 397–98 (finding corporate officer who concealed losses and falsified corporate financial records, some of which were submitted to financial institutions, "affected a financial institution"); *United States v. Schinnell,* 80 F.3d 1064, 1070 (5th Cir.1996) (upholding enhancement where defendant improperly withdrew funds from her employer's bank account, because "direct harm to the banks involved was certainly reasonably foreseeable" and "the banks [were] realistically exposed to substantial potential liability as the result of [defendant's] fraud").

activity was 'otherwise extensive.' " *United States v. Katora,* 981 F.2d 1398, 1405 (3d Cir.1992).

In the Sentencing Memorandum, the District Court explains there was only one other "participant" (accountant Andrew Cunningham), but the enhancement was appropriate because the criminal activity was "otherwise extensive." *See United States v. Bennett,* 9 F.Supp.2d 513, 521–22 (E.D.Pa.1998). We believe this holding was correct. The Sentencing Guidelines define a "participant" as a "person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. (n.1). Only Cunningham, who pleaded guilty to charges related to Bennett's offenses, appears to fit this description. However, the Guidelines also instruct that in assessing whether an organization is "otherwise extensive," "all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, cmt. (n.3).[13]

In addition to enlisting Cunningham's services, Bennett actively used his New Era staff to perpetrate extensive fraud. The Sentencing Memorandum identifies by name seven employees who, unwittingly and at Bennett's direction, contributed to Bennett's scheme by withholding requested documents and information from investors. *See Ben-*

nett, 9 F.Supp.2d at 523–24. It also notes that Bennett hired several attorneys and accountants to prepare reports based on false information that Bennett had given them, and then used their imprimatur of propriety to pass off New Era as a legitimate charitable organization. Additionally, Bennett instructed employees at Prudential Securities not to reveal that New Era funds on deposit there were not held in "escrow or quasi-escrow" accounts, as Bennett had told investors. In all, the District Court counted "at least 13 innocent individuals" whom Bennett used to assist him in the commission of his crimes. *Id.* 9 F.Supp.2d at 523.

All of these findings are amply supported by the presentence report and by the District Court's findings at the sentencing hearing. Accordingly, we believe the District Court adequately articulated the factual bases for concluding that Bennett was the leader of an "otherwise extensive" criminal enterprise.[14]

### 4. Abuse of a Position of Trust

 Bennett argues the District Court failed to make the necessary findings to support its determination that Bennett should receive a two-level upward adjustment for abusing a "position of trust" under U.S.S.G. § 3B1.3. According to Bennett, the enhancement is unwarranted because he held no "insider" position facilitating the offense or causing the victims to rely on his integrity.

---

**13.** The Sentencing Commission describes the purpose of the enhancement as follows:

> This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (*i.e.,* the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.
>
> In relatively small criminal enterprises that are otherwise to be considered extensive in scope or in planning or preparation, the distinction between organization and leadership,

and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated divisions of responsibility.

U.S.S.G. § 3B1.1 cmt. (backg'd).

**14.** *See also United States v. D'Andrea,* 107 F.3d 949, 957 (1st Cir.1997) (holding that the determination of whether a criminal enterprise is "extensive" under U.S.S.G. § 3B1.1 derives from the " 'totality of the circumstances,' " including not only the number of participants, but also the " 'width, breadth, scope, complexity, and duration of the scheme' "); *United States v. Dietz,* 950 F.2d 50, 53 (1st Cir.1991) (noting when sentencing court finds defendant's scheme involved one other criminal participant "the court is free to consider the use of unwitting outsiders in determining if a criminal enterprise is 'extensive' within the contemplation of section 3B1.1").

Bennett also argues the enhancement is designed to apply to those who misuse their own positions of trust or special skills, and therefore should not be based on Bennett's use of fiduciaries such as lawyers, accountants, and stock brokers to assist the New Era organizations.

The Sentencing Guidelines provide for a two-level upward adjustment if the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense...." U.S.S.G. § 3B1.3. The application notes state:

"Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily nondiscretionary in nature. For this enhancement to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

U.S.S.G. § 3B1.3 cmt. (nn.1, 2). We have identified several factors relevant to determining what constitutes a "position of trust" for purposes of U.S.S.G. § 3B1.3:

(1) whether the position allows the defendant to commit a difficult-to-detect wrong; (2) the degree of authority which the position vests in defendant vis-a-vis the object of the wrongful act; and (3) whether there has been reliance on the integrity of the person occupying the position. These factors should be considered in light of the guiding rationale of the section—to punish "insiders" who abuse their position rather than those who take advantage of an available opportunity.

*United States v. Pardo*, 25 F.3d 1187, 1192 (3d Cir.1994) (finding the defendant did not occupy a position of trust merely because he was the friend of the bank manager in a check-kiting and loan fraud scheme).[15]

Evaluating these criteria, we find the enhancement for abuse of a position of trust was fully justified. Bennett's position as president and sole director of the New Era organizations greatly reduced the probability that the fraudulent offenses would be detected. His absolute control over the organizations enabled him to conceal his crimes from detection for approximately six years. In particular, Bennett's authority allowed him to disseminate falsehoods about trust agreements and anonymous benefactors, misrepresent that he received no compensation for his charitable efforts, create a phony board of directors made up of prominent individuals, deceive investors that funds deposited with New Era organizations were held in escrow or quasi-escrow accounts, and provide false information to the I.R.S. and investors.

---

**15.** *See also United States v. Turner*, 102 F.3d 1350, 1360 (4th Cir.1996) (finding mine owners and operators who falsified forms abused positions of trust because they exercised managerial discretion, employees trusted them and deferred to their judgment regarding mine safety, and the public trusted them to follow mine safety laws); *United States v. Sokolow*, 91 F.3d 396, 413 (3d Cir.1996) (upholding enhancement because president and owner of company "was able to commit difficult-to-detect wrongs, as he had sole control over [the company's] accounts without oversight or supervision"); *United States v. Lilly*,

37 F.3d 1222, 1227 (7th Cir.1994) (holding that a position of trust is characterized by " 'access or authority over valuable things' ") (citations omitted); *Marcum*, 16 F.3d at 603–04 (finding enhancement appropriate because "[a]s president, Marcum was responsible for running the games and completing and mailing the financial returns; without this position of trust, he would not have the had the opportunity to commit the crime"); *United States v. Queen*, 4 F.3d 925, 929 (10th Cir.1993) ("[T]he question of whether an individual occupies a position of trust should be addressed from the perspective of the victim.").

In all of these undertakings, it was Bennett's position of trust that cloaked him with the requisite authority to deceive. Because New Era had no genuine board of directors, Bennett acted without supervision and exercised unlimited managerial discretion over the organizations and their staffs. Additionally, he had unchecked authority to make withdrawals and deposits from company accounts, to invade the "command" account in which all donations were held, and to transfer funds from one organization to another.

Furthermore, it is clear the victims relied on Bennett's integrity when making donations. They believed, based on his representations, that their money would be held in low-risk accounts to be matched by anonymous donors and ultimately used for charitable purposes. It was this fiduciary position that Bennett occupied—not his use of additional fiduciaries such as lawyers and accountants—that caused the District Court to find Bennett held a position of trust relative to his victims. We believe the District Court properly increased Bennett's offense level for abuse of a position of trust.

### 5. Acceptance of Responsibility

Bennett asserts the District Court failed to make adequate findings of fact to explain its denial of a two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1. He claims his acceptance of responsibility is demonstrated by his guilty plea, his decision to cooperate prior to the initiation of a criminal investigation with the Bankruptcy Trustee and Bankruptcy Court, and his surrender of a large portion of his personal assets. He further argues that as a matter of law, there is no categorical rule against granting an acceptance-of-responsibility adjustment when the defendant pleads nolo contendere rather than guilty.[16]

U.S.S.G. § 3E1.1(a) provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." In determining whether a defendant qualifies for a reduction under this provision, the District Court is not required to limit its analysis solely to whether the defendant entered a guilty plea:

> Entry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 (Relevant Conduct) ... will constitute significant evidence of acceptance of responsibility for the purposes of subsection (a). However, this evidence may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right.

U.S.S.G. § 3E1.1 cmt. (nn.1, 3); *see United States v. Singh*, 923 F.2d 1039, 1043 (3d Cir.1991) ("[A] plea of guilty is not dispositive as to the defendant's acceptance of responsibility."). Moreover, the District Court's decision whether to grant the adjustment is entitled to "great deference" on review because "[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. (n.5); *see also United States v. Cianscewski*, 894 F.2d 74, 83 (3d Cir.1990) (holding the District Court's determination that defendant did not accept responsibility will be reversed only if "clearly erroneous"). The defendant bears the burden of proving that he is entitled to the downward adjustment. *See, e.g., United States v. Bermea*, 30 F.3d 1539, 1577 (5th Cir.1994); *United States v. Barry*, 961 F.2d 260, 266 (D.C.Cir.1992).

---

16. A plea of nolo contendere, "like the plea of guilty ... is an admission of guilt for the purposes of the case." *Hudson v. United States*, 272 U.S. 451, 455, 47 S.Ct. 127, 71 L.Ed. 347 (1926). More specifically, it is the

> [t]ype of plea which may be entered with leave of court to a criminal complaint or indictment by which the defendant does not admit or deny

the charges, though a fine or sentence may be imposed pursuant to it. . . . The principal difference between a plea of guilty and a plea of nolo contendere is that the latter may not be used against the defendant in a civil action based upon the same acts.

Black's Law Dictionary 1048 (6th ed. 1990).

We find the District Court did not err in declining to reduce Bennett's offense level for acceptance of responsibility. The presentence report recommended against such an adjustment because Bennett continued "to deny factual guilt and criminal intent for his actions." In the press release announcing his decision to plead nolo contendere, Bennett made a point of stating he did not admit to the government's version of the facts.[17] More importantly, at the sentencing hearing Bennett continued to deny culpability:

> Though I know if I were to state my guilt in regard to certain facts of this case, my sentence would be less, I just can't do that. I never intended to defraud or hurt anyone. The benefactors were real to me at that time and I never bribed Mr. Cunningham. . . . The words he stated I said to him after helping him are completely alien to my nature.

Bennett also denied that he transferred New Era funds to his personal accounts and for-profit businesses, created a fictitious board of directors, or fabricated minutes of their "meetings." Bennett's testimony provided a sufficient basis for the District Court to conclude Bennett had not accepted responsibility for his actions. *See, e.g., United States v. Muhammad*, 146 F.3d 161, 168 (3d Cir.1998) (upholding denial of adjustment for accep-

tance of responsibility where defendant offered no "genuine show of contrition"); *United States v. Veksler*, 62 F.3d 544, 551 (3d Cir.1995) (upholding denial where defendant did not admit to the crimes charged in the indictment).

■ We also reject Bennett's argument that he is entitled to the adjustment because his nolo contendere plea is equivalent to a guilty plea. Even if the pleas are equivalent, the Guidelines make clear that a guilty plea does not carry with it an automatic entitlement to credit for acceptance of responsibility. *See* U.S.S.G. § 3E1.1 cmt. (nn.1, 3). Nor does Bennett's cooperation with the Bankruptcy Trustee and other government agencies automatically qualify him for the adjustment. These actions may constitute evidence of acceptance of responsibility, but the sentencing court was free to consider other evidence that is inconsistent with acceptance of responsibility, such as Bennett's repeated denials of culpability. Here, the District Court weighed the evidence and determined Bennett had not truly accepted responsibility for his crimes. Supported by the facts set forth in the presentence report (which the District Court expressly adopted) and by Bennett's own testimony at the sentencing hearing, the District Court was in the best position to

---

**17.** In a press release dated March 26, 1997, Bennett explained his reasons for entering the nolo contendere plea:

> By entering this nolo contendere plea, Mr. Bennett accepts responsibility for the consequences of his conduct in operating the Foundation for New Era Philanthropy ("New Era"). Mr. Bennett's decision is based, in part, on the Court's pretrial ruling which limited his ability to present psychiatric evidence on the issue of his intent. For this reason, Mr. Bennett's plea is conditional, thereby enabling him to appeal the court's ruling. . . .
>
> \*　\*　\*　\*　\*　\*
>
> After careful consideration of all of his options, including proceeding to trial or plea bargaining for a lesser sentence, Mr. Bennett chose to enter his nolo contendere plea. A plea of nolo contendere has historically been viewed "not as an express admission of guilt but as a consent by the defendant that he may be punished if he were guilty and a prayer for leniency." A nolo contendere plea was particularly appropriate in this case since, by his plea, Mr. Bennett does not admit or adopt as true the government's version of the facts, in-

sofar as those facts relate in any way to the issue of his intent to commit the crimes alleged in the indictment.

On April 16, 1997, Bennett distributed a letter to "those affected by the collapse of the Foundation for New Era Philanthropy" in which he stated that "I realize that by going to trial I could have defended myself against the allegations, many of which are untrue." In the letter, Bennett states he did not want to put his family, friends, staff, former associates, and charities through the experience of a trial. He also reveals:

> I could not plead guilty and plea bargain for a lesser sentence. All the counts charge me with the intent to defraud. By plea bargaining to those charges, I would be lying before my God to get a lesser sentence because I would have to admit an intent to defraud. There was never any intent, never a preconceived scheme, never a thought of devising a way to defraud anyone. I am responsible for my actions and I am prepared to accept responsibility for them. But I can never plead guilty to nor admit to the intent to defraud which I did not possess.

ascertain the genuineness of Bennett's contrition. We decline to disturb its finding.

## III. CONCLUSION

We hold the District Court did not abuse its discretion in excluding proposed questions for Bennett's expert witness under Federal Rule of Evidence 704(b). The questions called for responses stating expressly whether Bennett possessed the requisite mental state constituting elements of the crimes charged. We also hold the District Court made sufficient findings of fact as required by Federal Rule of Criminal Procedure 32 to resolve disputed points at sentencing relating to Bennett's misrepresentation of acting on behalf of a charity, his deriving more than $1 million from a fraud offense that affected a financial institution, his aggravating role in the offense, his abuse of a position of trust, and his acceptance of responsibility. Similarly, we approve the District Court's application of the Sentencing Guidelines on these issues.

Accordingly, we will affirm the judgment of sentence imposed by the District Court.